IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2013-NMSC-040

Filing Date:  August 22, 2013

Docket No. 33,687

ELANE PHOTOGRAPHY, LLC,

    Plaintiff-Petitioner,

v.

VANESSA WILLOCK,

    Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Alan M. Malott, District Judge**

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Emil John Kiehne
Albuquerque, NM

Becht Law Office
Paul F. Becht
Albuquerque, NM

Alliance Defending Freedom
Jordan W. Lorence
Washington, D.C.

Alliance Defending Freedom
James A. Campbell
Scottsdale, AZ

for Petitioner

Lopez, Sakura & Boyd, L.L.P.
Julie Sakura
Santa Fe, NM

Sarah Steadman

Santa Fe, NM

Tobias Barrington Wolff
Philadelphia, PA

for Respondent

Doughty & West, P.A.
Robert M. Doughty, III
William Wayne Wirkus
Albuquerque, NM

Asma Uddin
Diana Verm
Washington, D.C.

Douglas Laycock
Charlottesville, VA

for Amicus Curiae The Becket Fund for Religious Liberty

Law Office of Michael J. Thomas, L.L.C.
Michael J. Thomas
Las Cruces, NM

Eugene Volokh
Los Angeles, CA

for Amicus Curiae The Cato Institute

Evie M. Jilek
Albuquerque, NM

for Amici Curiae Wedding Photographers

Natalie A. Bruce
Albuquerque, NM

Steven H. Shiffrin
Ithaca, NY

for Amici Curiae Steven H. Shiffrin and Michael C. Dorf

Sutin, Thayer & Browne, P.C.
Kerry C. Kiernan
Lynn E. Mostoller
Albuquerque, NM

for Amicus Curiae New Mexico Small Businesses

ACLU of New Mexico
Laura Louise Schauer Ives
Albuquerque, NM

LGBT & AIDS Project, ACLU Foundation
Joshua A. Block
New York, NY

for Amici Curiae American Civil Liberties Union Foundation and American Civil
Liberties Union of New Mexico

**OPINION**

**CHÁVEZ, Justice.**

**{1}**     By enacting the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1
to -13 (1969, as amended through 2007), the Legislature has made the policy decision to
prohibit public accommodations from discriminating against people based on their sexual
orientation.  Elane Photography, which does not contest its public accommodation status
under the NMHRA, offers wedding photography services to the general public and posts its
photographs on a password-protected website for its customers.  In this case, Elane
Photography refused to photograph a commitment ceremony between two women.  The
questions presented are (1) whether Elane Photography violated the NMHRA when it
refused to photograph the commitment ceremony, and if so, (2) whether this application of
the NMHRA violates either the Free Speech or the Free Exercise Clause of the First
Amendment to the United States Constitution, or (3) whether this application violates the
New Mexico Religious Freedom Restoration Act (NMRFRA), NMSA 1978, §§ 28-22-1 to
-5 (2000).

**{2}**     First, we conclude that a commercial photography business that offers its services
to the public, thereby increasing its visibility to potential clients, is subject to the
antidiscrimination provisions of the NMHRA and must serve same-sex couples on the same
basis that it serves opposite-sex couples.  Therefore, when Elane Photography refused to
photograph a same-sex commitment ceremony, it violated the NMHRA in the same way as
if it had refused to photograph a wedding between people of different races.

**{3}**     Second, we conclude that the NMHRA does not violate free speech guarantees

3

because the NMHRA does not compel Elane Photography to either speak a government-mandated message or to publish the speech of another. The purpose of the NMHRA is to ensure that businesses offering services to the general public do not discriminate against protected classes of people, and the United States Supreme Court has made it clear that the First Amendment permits such regulation by states. Businesses that choose to be public accommodations must comply with the NMHRA, although such businesses retain their First Amendment rights to express their religious or political beliefs. They may, for example, post a disclaimer on their website or in their studio advertising that they oppose same-sex marriage but that they comply with applicable antidiscrimination laws. We also hold that the NMHRA is a neutral law of general applicability, and as such, it does not violate the Free Exercise Clause of the First Amendment.

**{4}** Finally, we hold that the NMRFRA is inapplicable in this case because the government is not a party. For these reasons, we affirm the judgment of the Court of Appeals.

**BACKGROUND**

**{5}** The NMHRA prohibits, among other things, discriminatory practices against certain defined classes of people. *See* § 28-1-7. In 2003, the NMHRA was amended to add "sexual orientation" as a class of persons protected from discriminatory treatment. 2003 N.M. Laws, ch. 383, § 2. "Sexual orientation" is defined in the NMHRA as "heterosexuality, homosexuality or bisexuality, whether actual or perceived." Section 28-1-2(P). In this case, we are concerned with discrimination by a public accommodation against a person because of that person's real or perceived homosexuality—that person's propensity to experience feelings of attraction and romantic love for other members of the same sex.

**{6}** "Public accommodation" is defined in the NMHRA as "any establishment that provides or offers its services, facilities, accommodations or goods to the public, but does not include a bona fide private club or other place or establishment that is by its nature and use distinctly private." Section 28-1-2(H). Thus, a business that elects not to offer its goods or services to the public is not subject to the NMHRA.

**{7}** Vanessa Willock contacted Elane Photography, LLC, by e-mail to inquire about Elane Photography's services and to determine whether it would be available to photograph her commitment ceremony[1] to another woman. Elane Photography's co-owner and lead photographer, Elaine Huguenin, is personally opposed to same-sex marriage and will not

[1]Willock referred to the event as a "commitment ceremony" in her e-mail to Elane Photography. However, the parties agree that the ceremony was essentially a wedding—Elane Photography emphasizes that there were vows, rings, a minister, flower girls, and a wedding dress, and Willock uses the word "wedding" to describe the ceremony in her brief. We use the terms "wedding" and "commitment ceremony" interchangeably.

photograph any image or event that violates her religious beliefs. Huguenin responded to Willock that Elane Photography photographed only "traditional weddings." Willock e-mailed back and asked, "Are you saying that your company does not offer your photography services to same-sex couples?" Huguenin responded, "Yes, you are correct in saying we do not photograph same-sex weddings," and thanked Willock for her interest.

**{8}** In order to verify Elane Photography's policy, Willock's partner, Misti Collinsworth, e-mailed Elane Photography and inquired about its willingness to photograph a wedding, without mentioning the sexes of the participants. Huguenin sent Collinsworth a list of pricing information and an invitation to meet with her and discuss her services. A few weeks later, Huguenin again e-mailed Collinsworth to follow up.

**{9}** Willock filed a discrimination complaint against Elane Photography with the New Mexico Human Rights Commission for discriminating against her based on her sexual orientation in violation of the NMHRA. The Commission concluded that Elane Photography had discriminated against Willock in violation of Section 28-1-7(F), which prohibits discrimination by public accommodations on the basis of sexual orientation, among other protected classifications. It awarded Willock attorneys' fees, which Willock later waived. No other monetary or injunctive relief was granted.

**{10}** Elane Photography appealed to the Second Judicial District Court for a trial de novo pursuant to Section 28-1-13(A). *See* NMSA 1978, § 39-3-1 (1955) ("All appeals from inferior tribunals to the district courts shall be tried anew in said courts on their merits, as if no trial had been had below, except as otherwise provided by law."). Elane Photography sought a reversal of the award of attorneys' fees, a declaratory judgment that it had not discriminated on the basis of sexual orientation, and a ruling that its rights had been violated, among other relief. The parties filed cross-motions for summary judgment, and the district court granted summary judgment for Willock. Elane Photography again appealed, and the Court of Appeals affirmed. *Elane Photography, LLC v. Willock*, 2012-NMCA-086, ¶ 1, 284 P.3d 428. We granted certiorari.

**{11}** Elane Photography argues before this Court that: (1) it did not discriminate on the basis of sexual orientation, and therefore it did not violate the NMHRA; or, alternatively, (2) by requiring Elane Photography to accept clients against its will, the NMHRA violates the protection of the First Amendment against compelled speech; (3) the NMHRA violates Elane Photography's First Amendment right to freely exercise its religion; and (4) the NMHRA violates Elane Photography's right under the NMRFRA to freely exercise its religion. For the reasons that follow, we reject Elane Photography's arguments and affirm summary judgment for Willock.

**DISCUSSION**

**{12}** The parties agree on the facts in this case, and the only question for this Court to consider is whether Willock is entitled to judgment as a matter of law. *See Self v. United*

5

*Parcel Serv., Inc.*, 1998-NMSC-046, ¶ 6, 126 N.M. 396, 970 P.2d 582 ("Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."). On appeal, we review a grant of summary judgment de novo. *Id.*

## I. ELANE PHOTOGRAPHY REFUSED TO SERVE WILLOCK ON THE BASIS OF HER SEXUAL ORIENTATION IN VIOLATION OF THE NMHRA

**{13}** The NMHRA seeks to promote the equal rights of people within certain specified classes by protecting them against discriminatory treatment. *See Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 14, 139 N.M. 12, 127 P.3d 548 ("The NMHRA protects against discriminatory treatment . . . ."). To accomplish this goal, the NMHRA makes it unlawful for "any person in any public accommodation to make a distinction, directly or indirectly, in offering or refusing to offer its services, facilities, accommodations or goods to any person because of race, religion, color, national origin, ancestry, sex, *sexual orientation*, gender identity, spousal affiliation or physical or mental handicap." Section 28-1-7(F) (emphasis added). The Court of Appeals affirmed the district court's holding that Elane Photography was a public accommodation under Section 28-1-2(H), *Elane Photography*, 2012-NMCA-086, ¶ 18, and Elane Photography did not challenge that holding in this appeal. Accordingly, Elane Photography waived its right to challenge that conclusion as a matter of New Mexico law. *See Fikes v. Furst*, 2003-NMSC-033, ¶ 8, 134 N.M. 602, 81 P.3d 545 ("[I]t is improper for this Court to consider any questions except those set forth in the petition for certiorari."). We therefore accept the Court of Appeals' conclusion that at the time of its interactions with Willock and Collinsworth, Elane Photography was a public accommodation as defined in Section 28-1-2(H), and as such, was subject to Section 28-1-7(F) of the NMHRA. *See Elane Photography*, 2012-NMCA-086, ¶¶ 14, 18.

**{14}** Elane Photography argues that it did not violate the NMHRA because it did not discriminate on the basis of sexual orientation when it refused service to Willock. Instead, Elane Photography explains that it "did not want to convey through [Huguenin]'s pictures the story of an event celebrating an understanding of marriage that conflicts with [the owners'] beliefs." Elane Photography argues that it would have taken portrait photographs and performed other services for same-sex customers, so long as they did not request photographs that involved or endorsed same-sex weddings. However, Elane Photography's owners testified that they would also have refused to take photos of same-sex couples in other contexts, including photos of a couple holding hands or showing affection for each other. Elane Photography also argues in its brief that it would have turned away heterosexual customers if the customers asked for photographs in a context that endorsed same-sex marriage. For example, Elane Photography states that it "would have declined the request even if the ceremony was part of a movie and the actors playing the same-sex couple were heterosexual." Therefore, Elane Photography reasons that it did not discriminate "because of . . . sexual orientation," § 28-1-7(F), but because it did not wish to endorse Willock's and Collinsworth's wedding.

6

**{15}** The NMHRA prohibits discrimination in broad terms by forbidding "any person in any public accommodation to make a distinction, *directly or indirectly*, in offering or refusing to offer its services . . . because of . . . sexual orientation." Section 28-1-7(F) (emphasis added). Elane Photography is primarily a wedding photography business. It provides wedding photography services to heterosexual couples, but it refuses to work with homosexual couples under equivalent circumstances.

**{16}** Elane Photography's argument is an attempt to distinguish between an individual's status of being homosexual and his or her conduct in openly committing to a person of the same sex. It was apparently Willock's e-mail request to have Elane Photography photograph Willock's commitment ceremony to another woman that signaled Willock's sexual orientation to Elane Photography, regardless of whether that assessment was real or merely perceived. The difficulty in distinguishing between status and conduct in the context of sexual orientation discrimination is that people may base their judgment about an individual's sexual orientation on the individual's conduct. To allow discrimination based on conduct so closely correlated with sexual orientation would severely undermine the purpose of the NMHRA.

**{17}** The United States Supreme Court has rejected similar attempts to distinguish between a protected status and conduct closely correlated with that status. In *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, ___ U.S. ___, ___, 130 S. Ct. 2971, 2980 (2010), students at Hastings College of the Law formed a chapter of the Christian Legal Society and sought formal recognition from the school. The Christian Legal Society required its members to affirm their belief in the divinity of Jesus Christ and to refrain from "'unrepentant homosexual conduct.'" *Id. & id.* n.3. Hastings refused to recognize the organization on the ground that it violated Hastings' nondiscrimination policy, which prohibited exclusion based on religion or sexual orientation. *Id.* at ___, 130 S. Ct. at 2980. The Christian Legal Society argued that "it [did] not exclude individuals because of sexual orientation, but rather on the basis of a conjunction of conduct and the belief that the conduct is not wrong." *Id.* at ___, 130 S. Ct. at 2990 (internal quotation marks omitted). The United States Supreme Court rejected this argument, stating:

> Our decisions have declined to distinguish between status and conduct in this context. See *Lawrence v. Texas*, 539 U.S. 558, 575, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) ("When homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination." (emphasis added)); *id.*, at 583, 123 S.Ct. 2472 (O'Connor, J., concurring in judgment) ("While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, [the] law is targeted at more than conduct. It is instead directed toward gay persons as a class."); cf. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) ("A tax on wearing yarmulkes is a tax on Jews.").

7

*Id.* We agree that when a law prohibits discrimination on the basis of sexual orientation, that law similarly protects conduct that is inextricably tied to sexual orientation. Otherwise we would interpret the NMHRA as protecting same-gender couples against discriminatory treatment, but only to the extent that they do not openly display their same-gender sexual orientation.

{18} In this case, we see no basis for distinguishing between discrimination based on sexual orientation and discrimination based on someone's conduct of publicly committing to a person of the same sex. Our role is to determine and follow the intent of the Legislature, *State v. Hall*, 2013-NMSC-001, ¶ 9, 294 P.3d 1235, and the NMHRA evinces a clear intent to prevent discrimination as it is broadly defined in Section 28-1-7(F). New Mexico has a strong state policy of promoting equality for its residents regardless of sexual orientation. *See* Section 28-1-7 (defining unlawful discriminatory practices); NMSA 1978, § 29-21-2 (2009) (prohibiting profiling by law enforcement on the basis of sexual orientation); NMSA 1978, § 31-18B-2(D) (2007) (including sexual orientation as a protected status under the Hate Crimes Act); *Chatterjee v. King*, 2012-NMSC-019, ¶ 36, 280 P.3d 283 (recognizing that a child can have two legal parents of the same sex); *In re Jacinta M.*, 1988-NMCA-100, ¶ 11, 107 N.M. 769, 764 P.2d 1327 (holding that a children's court could not find a custodian unsuitable solely because of his or her sexual orientation). As a matter of New Mexico law, the NMHRA prohibits a public accommodation from refusing to serve a client based on sexual orientation, and Elane Photography violated the law by refusing to photograph Willock's same-sex commitment ceremony.

{19} We are not persuaded by Elane Photography's argument that it does not violate the NMHRA because it will photograph a gay person (for example, in single-person portraits) so long as the photographs do not reflect the client's sexual preferences. The NMHRA prohibits public accommodations from making any distinction in the services they offer to customers on the basis of protected classifications. Section 28-1-7(F). For example, if a restaurant offers a full menu to male customers, it may not refuse to serve entrees to women, even if it will serve them appetizers. The NMHRA does not permit businesses to offer a "limited menu" of goods or services to customers on the basis of a status that fits within one of the protected categories. Therefore, Elane Photography's willingness to offer some services to Willock does not cure its refusal to provide other services that it offered to the general public. Similarly, it does not help Elane Photography to argue that it would have turned away heterosexual polygamous weddings or heterosexual persons pretending to have a same-sex wedding. Those situations are not at issue here, and, if anything, these arguments support a finding that Elane Photography intended to discriminate against Willock based on her same-sex sexual orientation. Therefore, we hold that Elane Photography discriminated against Willock on the basis of sexual orientation in violation of the NMHRA.

## II.  THE NMHRA DOES NOT VIOLATE ELANE PHOTOGRAPHY'S FIRST AMENDMENT RIGHTS

{20} Elane Photography challenges enforcement of the NMHRA on the grounds that

enforcement of the law violates its right to free speech and the free exercise of its religion under the First Amendment to the United States Constitution. For the reasons that follow, we reject both of these arguments.

## A. THE NMHRA DOES NOT VIOLATE ELANE PHOTOGRAPHY'S FREE SPEECH RIGHTS

**{21}** Specifically regarding its free speech rights, Elane Photography argues that the NMHRA compels it to speak in violation of the First Amendment by requiring it to photograph a same-sex commitment ceremony, even though it is against the owners' personal beliefs. We disagree.

**{22}** The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. This prohibition applies equally to state governments. *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (assuming without deciding that free speech and press rights are incorporated by the Due Process Clause of the Fourteenth Amendment); *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) ("It has long been established that these First Amendment freedoms [of speech, assembly, and petition] are protected by the Fourteenth Amendment from invasion by the States."). United States Supreme Court precedent makes it clear that the right to speak freely includes the right to refrain from speaking. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.").

**{23}** Elane Photography observes that photography is an expressive art form and that photographs can fall within the constitutional protections of free speech. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (observing that abstract art and instrumental music are "unquestionably shielded" by the First Amendment). Elane Photography also states that in the course of its business, it creates and edits photographs for its clients so as to tell a positive story about each wedding it photographs, and the company and its owners would prefer not to send a positive message about same-sex weddings or same-sex marriage. Elane Photography concludes that by requiring it to photograph same-sex weddings on the same basis that it photographs opposite-sex weddings, the NMHRA unconstitutionally compels it to "create and engage in expression" that sends a positive message about same-sex marriage not shared by its owner.

**{24}** The compelled-speech doctrine on which Elane Photography relies is comprised of two lines of cases. The first line of cases establishes the proposition that the government may not require an individual to "speak the government's message." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006). The second line of cases prohibits the government from requiring a private actor "to host or accommodate another speaker's message." *Id.* Elane Photography argues that by requiring it to photograph same-sex weddings on the same basis as opposite-sex weddings, the NMHRA violates both prohibitions. We address each argument in turn.

9

**1.     The NMHRA does not compel Elane Photography to speak the government's message**

**{25}**    The right to refrain from speaking was established in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), in which the United States Supreme Court held that the State of West Virginia could not constitutionally require students to salute the American flag and recite the Pledge of Allegiance.  The Court held that a state could not require "affirmation of a belief and an attitude of mind," *id.* at 633, and that the state had impermissibly "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control," *id.* at 642.

**{26}**    Similarly, in *Wooley*, 430 U.S. at 717, the United States Supreme Court held that the State of New Hampshire could not constitutionally punish a man for covering the state motto on the license plate of his car.  The *Wooley* plaintiffs considered "Live Free or Die," the state motto, "repugnant to their moral, religious, and political beliefs," *id.* at 707, and they raised a First Amendment challenge to the state's law forbidding residents to hide or alter the motto.  *Id.* at 709, 713.  The *Wooley* Court framed the question presented as "whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his [or her] private property in a manner and for the express purpose that it be observed and read by the public" and concluded that the measure was unconstitutional.  *Id.* at 713.

**{27}**    Elane Photography reads *Wooley* and *Barnette* to mean that the government may not compel people "to engage in unwanted expression."  However, the cases themselves are narrower than Elane Photography suggests; they involve situations in which the speakers were compelled to publicly "speak the government's message."  *Rumsfeld*, 547 U.S. at 63.  In *Wooley* and *Barnette*, the respective states impermissibly required their residents to affirm or display a specific government-selected message:  "Live Free or Die" in *Wooley*, 430 U.S. at 707, and allegiance to the flag in *Barnette*, 319 U.S. at 632-33.  Both cases stand for the proposition that the First Amendment does not permit the government to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."  *Barnette*, 319 U.S. at 642.  However, unlike the laws at issue in *Wooley* and *Barnette*, the NMHRA does not require Elane Photography to recite or display any message.  It does not even require Elane Photography to take photographs.  The NMHRA only mandates that if Elane Photography operates a business as a public accommodation, it cannot discriminate against potential clients based on their sexual orientation.

**{28}**    Furthermore, the laws at issue in *Wooley* and *Barnette* had little purpose other than to promote the government-sanctioned message.  *See Wooley*, 430 U.S. at 716-17 (rejecting the state's contentions that (1) the state motto made it easier for law enforcement to identify improper license plates, and (2) the state hoped "to communicate to others an official view as to proper appreciation of history, state pride, and individualism"); *Barnette*, 319 U.S. at 640 (identifying "national unity" as the goal of compulsory flag salutes (internal quotation

10

marks and citation omitted)). The *Barnette* Court noted that the dissenting students' choice not to salute the flag "[did] not bring them into collision with rights asserted by any other individual." 319 U.S. at 630. That is not the case here, where Elane Photography's asserted right not to serve same-sex couples directly conflicts with Willock's right under Section 28-1-7(F) of the NMHRA to obtain goods and services from a public accommodation without discrimination on the basis of her sexual orientation. Antidiscrimination laws have important purposes that go beyond expressing government values: they ensure that services are freely available in the market, and they protect individuals from humiliation and dignitary harm. *See Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (stating that the purpose of Title II of the Civil Rights Act of 1964 was "to [re]move the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public" (internal quotation marks and citation omitted)); *Katzenbach v. McClung*, 379 U.S. 294, 299-300 (1964) (discussing the economic impact of discrimination in public accommodations).

**{29}** The fact that compliance with the NMHRA will require Elane Photography to produce photographs for same-sex weddings to the extent that it would provide those services to a heterosexual couple does not mean that the NMHRA compels speech in the manner of the laws challenged in *Wooley* and *Barnette*. Elane Photography's argument here is more analogous to the claims raised by the law schools in *Rumsfeld*. In that case, a federal law made universities' federal funding contingent on the universities allowing military recruiters access to university facilities and services on the same basis as other, non-military recruiters. 547 U.S. at 52-53. A group of law schools that objected to the ban on gays in the military challenged the law on a number of constitutional grounds, including that the law in question compelled them to speak the government's message. *Id.* at 52, 53, 61-62. In order to assist the military recruiters, schools had to provide services that involved speech, "such as sending e-mails and distributing flyers." *Id.* at 60.

**{30}** The United States Supreme Court held that this requirement did not constitute compelled speech. *Id.* at 62. The Court observed that the federal law "neither limits what law schools may say nor requires them to say anything." *Id.* at 60. Schools were compelled only to provide the type of speech-related services to military recruiters that they provided to non-military recruiters. *Id.* at 62. "There [was] nothing . . . approaching a Government-mandated pledge or motto that the school [had to] endorse." *Id.*

**{31}** The same situation is true in the instant case. Like the law in *Rumsfeld*, the NMHRA does not require any affirmation of belief by regulated public accommodations; instead, it requires businesses that offer services to the public at large to provide those services without regard for race, sex, sexual orientation, or other protected classifications. Section 28-1-7(F). The fact that these services may involve speech or other expressive services does not render the NMHRA unconstitutional. *See Rumsfeld*, 547 U.S. at 62 ("The compelled speech to which the law schools point is plainly incidental to the [law's] regulation of conduct, and it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out

by means of language, either spoken, written, or printed." (internal quotation marks and citation omitted)). Elane Photography is compelled to take photographs of same-sex weddings only to the extent that it would provide the same services to a heterosexual couple. *See id.* at 62 (speech assisting military recruiters was "only 'compelled' if, and to the extent, the school provide[d] such speech for other recruiters").

**2.      The NMHRA does not compel Elane Photography to host or accommodate the message of another speaker**

**a.      *State laws prohibiting discrimination by public accommodations do not constitute compelled speech***

**{32}**      The second line of compelled-speech cases deals with situations in which a government entity has required a speaker to "host or accommodate another speaker's message." *Id.* at 63.  Elane Photography argues that a same-sex wedding or commitment ceremony is an expressive event, and that by requiring it to accept a client who is having a same-sex wedding, the NMHRA compels it to facilitate the messages inherent in that event. Elane Photography argues that there are two messages conveyed by a same-sex wedding or commitment ceremony:  first, that such ceremonies exist, and second, that these occasions deserve celebration and approval.  Elane Photography does not wish to convey either of these messages.

**{33}**      The United States Supreme Court has never found a compelled-speech violation arising from the application of antidiscrimination laws to a for-profit public accommodation. In fact, it has suggested that public accommodation laws are generally constitutional.  *See Hurley*, 515 U.S. at 572 ("Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments . . . . [T]he focal point of [such statutes is] rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds.").  The United States Supreme Court has found constitutional problems with some applications of state public accommodation laws, but those problems have arisen when states have applied their public accommodation laws to free-speech events such as privately organized parades, *id.* at 566, 573, 580-81, and private membership organizations, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659, 659 n.4 (2000).[2]  Elane Photography, however, is an ordinary public accommodation, a "clearly commercial entit[y]," *id.* at 657, that sells goods and services to the public.

**{34}**      The NMHRA does not, nor could it, regulate the content of the photographs that Elane Photography produces.  It does not, for example, mandate that Elane Photography take

---

[2]*Dale* also was decided on freedom of association grounds.  *Id.* at 644.  Elane Photography has not argued that its right of expressive association was violated.

12

posed photographs rather than candid shots, nor does it require every wedding album to contain a picture of the bride's bouquet. Indeed, the NMHRA does not mandate that Elane Photography choose to take wedding pictures; that is the exclusive choice of Elane Photography. Like all public accommodation laws, the NMHRA regulates "the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." *See Hurley*, 515 U.S. at 572 (describing the Massachusetts public accommodation law). Elane Photography argues that because the service it provides is photography, and because photography is expressive, "some of [the] images will inevitably express the messages inherent in [the] event." In essence, then, Elane Photography argues that by limiting its ability to choose its clients, the NMHRA forces it to produce photographs expressing its clients' messages even when the messages are contrary to Elane Photography's beliefs.

**{35}** Elane Photography has misunderstood this issue. It believes that because it is a photography business, it cannot be subject to public accommodation laws. The reality is that because it is a public accommodation, its provision of services can be regulated, even though those services include artistic and creative work. If Elane Photography took photographs on its own time and sold them at a gallery, or if it was hired by certain clients but did not offer its services to the general public, the law would not apply to Elane Photography's choice of whom to photograph or not. The difference in the present case is that the photographs that are allegedly compelled by the NMHRA are photographs that Elane Photography produces for hire in the ordinary course of its business as a public accommodation. This determination has no relation to the artistic merit of photographs produced by Elane Photography. If Annie Leibovitz or Peter Lindbergh worked as public accommodations in New Mexico, they would be subject to the provisions of the NMHRA. Unlike the defendants in *Hurley* or the other cases in which the United States Supreme Court has found compelled-speech violations, Elane Photography sells its expressive services to the public. It may be that Elane Photography expresses its clients' messages in its photographs, but only because it is hired to do so. The NMHRA requires that Elane Photography perform the same services for a same-sex couple as it would for an opposite-sex couple; the fact that these services require photography stems from the nature of Elane Photography's chosen line of business.

**{36}** The cases in which the United States Supreme Court found that the government unconstitutionally required a speaker to host or accommodate another speaker's message are distinctly different because they involve direct government interference with the speaker's own message, as opposed to a message-for-hire. In two cases, the Court found a compelled-speech problem where the government explicitly required a publisher to distribute an opposing point of view. In the first of these cases, *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 244 (1974), the United States Supreme Court invalidated Florida's "'right of reply'" statute. The law provided that if a candidate for public office was criticized in a Florida newspaper, the candidate could demand that the newspaper print his or her reply, free of cost, in as conspicuous a location as the criticism that had appeared. *Id.* The Court expressed concern that the statute might deter editors from printing criticism of candidates,

13

thereby chilling political news coverage and commentary in the state. *Id.* at 257. Furthermore, the statute unconstitutionally wrested control over editorial decisions about "[t]he choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials" away from the editors and into the hands of the state. *Id.* at 258.

**{37}**     Similarly, in *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1, 4, 20-21, 26 (1986) (plurality opinion; Marshall, J., concurring in judgment), a plurality of the United States Supreme Court held unconstitutional a decision by the California Public Utilities Commission to allow a third-party group to send out messages with a utility's billing statements. The utility had traditionally distributed a newsletter to its customers with its monthly billing statements. *Id.* at 5 (plurality opinion). The Public Utility Commission decided that the space in the billing envelopes belonged to the customers, not to the utility, and it allowed an intervenor in a ratemaking proceeding involving the utility to send out messages in the utility's billing envelopes four times per year. *Id.* at 5-6, 13 (plurality opinion). Citing *Tornillo*, the United States Supreme Court held that this decision unconstitutionally compelled the utility to accommodate the intervenor's speech. *Pacific Gas*, 475 U.S. at 9-13 (plurality opinion). The Court noted that the Commission's ruling required the utility to disseminate messages that were hostile to the utility's own interests, *id.* at 14 (plurality opinion), and, depending on what the intervenors said, the utility might "be forced either to appear to agree with [the intervenors'] views or to respond," when it would have preferred to remain silent on an issue. *Id.* at 15 (plurality opinion).

**{38}**     In both *Pacific Gas* and *Tornillo*, the government commandeered a speaker's means of reaching its audience and required the speaker to disseminate an opposing point of view. Nothing analogous occurred in the present case. Elane Photography is not required to print the names and addresses of rival photographers in its albums, nor does Elane Photography distribute a newsletter in which the government has required it to print someone else's ideas. Instead, the allegedly compelled message is Elane Photography's own work on behalf of its clients, which it distributes only to its clients and their loved ones. The government has not interfered with Elane Photography's editorial judgment; the only choice regulated is Elane Photography's choice of clients.

**{39}**     In addition, although Elane Photography raises concerns that its speech will be chilled, there is no risk of a chilling effect in this case. In *Tornillo*, the "'right of reply'" statute could have discouraged newspapers from printing criticism of political candidates. 418 U.S. at 257. By contrast, the relevant choice facing Elane Photography and similar businesses is not whether to publish a story, as in *Tornillo*, but whether to operate as a public accommodation. If a commercial photography business wishes to offer its services to the public, thereby increasing its visibility to potential clients, it will be subject to the antidiscrimination provisions of the NMHRA. If a commercial photography business believes that the NMHRA stifles its creativity, it can remain in business, but it can cease to offer its services to the public at large. Elane Photography's choice to offer its services to the public is a business decision, not a decision about its freedom of speech.

14

**{40}**     In *Pacific Gas* and *Tornillo*, a government entity overtly required a speaker to publicize an opposing message. Elane Photography cites a third case, *Hurley*, in which the compelled-speech violation was more subtle. In *Hurley*, 515 U.S. at 560-61, the private organizers of the Boston St. Patrick's Day parade denied the application of a group of gay, lesbian, and bisexual Irish-Americans (known as GLIB) to march as a unit in the parade. *Id.* at 561. Massachusetts courts held that this constituted discrimination on the basis of sexual orientation. *Id.* at 561, 563-64. The United States Supreme Court reversed, holding that the parade did not discriminate against gay participants; instead, the issue was "the admission of GLIB as its own parade unit carrying its own banner," which had unquestionable expressive content. *Id.* at 572, 581.

**{41}**     *Hurley* is different from the instant case in two significant ways. First, the Massachusetts courts appear to have erroneously classified the privately organized parade as a public accommodation. *See id.* at 573 ("[T]he state courts' application of the statute had the effect of declaring the sponsors' speech itself to be the public accommodation."). Second, parades by their nature express a message to the public. *Id.* at 568. By requiring the parade organizers to include GLIB, the Massachusetts courts directly altered the expressive content of the parade. *Id.* at 572-73. The presence of a group in a parade carries expressive weight, and *Hurley* implicated associational rights as well as free-speech rights. *Id.* at 565; *see Dale*, 530 U.S. at 659 ("Although we did not explicitly deem the parade in *Hurley* an expressive association, the analysis we applied there is similar to the analysis we apply here."). Elane Photography argues that photographs are also inherently expressive, so *Hurley* must apply to this case as well. However, the NMHRA applies not to Elane Photography's photographs but to its business operation, and in particular, its business decision not to offer its services to protected classes of people. While photography may be expressive, the operation of a photography business is not. By way of analogy, the NMHRA could not dictate which groups a parade organizer had to include. However, if a business sold parade-planning services, and that business operated as a public accommodation, the NMHRA would prohibit that business from refusing to offer parade-planning services to persons because of their sexual orientation. Thus, Elane Photography's reliance on *Hurley* is misplaced.

**{42}**     Elane Photography's situation is actually clearer than that of our hypothetical business that organized parades, because even a parade for hire would still be a public event. *See id.* at 568 (describing the public nature of parades and their dependence on parade-watchers). By contrast, Elane Photography does not routinely publish for or display its wedding photographs to the public. Instead, it creates an album for each customer and posts the photographs on a password-protected website for the customers and their friends and family to view. Whatever message Elane Photography's photographs may express, they express that message only to the clients and their loved ones, not to the public.

**{43}**     We note that when Elane Photography displays its photographs publicly and on its own behalf, rather than for a client, such as in advertising, its choices of which photographs to display are entirely its own. The NMHRA does not require Elane Photography to either

15

include photographs of same-sex couples in its advertisements or display them in its studio. However, if Elane Photography offers its services to the public, the NMHRA requires Elane Photography to provide those same services to clients who are members of a protected class under the NMHRA.

**b.** *Observers are unlikely to believe that Elane Photography's photographs reflect the views of either its owners or its employees*

{44}     Elane Photography also argues that if it is compelled to photograph same-sex weddings, observers will believe that it and its owners approve of same-sex marriage. The United States Supreme Court incorporates the question of perceived endorsement into its analysis in cases that involve compulsion to host or accommodate third-party speech. *See, e.g.*, *Hurley*, 515 U.S. at 577 ("Without deciding on the precise significance of the likelihood of misattribution, it nonetheless becomes clear that in the context of an expressive parade . . . the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole."). The *Hurley* Court observed that admitting GLIB or any other organization into a parade would likely be perceived as a message from the parade organizers "that [GLIB's] message was worthy of presentation and quite possibly of support as well." *Id.* at 575. Therefore, the Court further observed that the government's forced inclusion of GLIB compromised the parade organizer's "right to autonomy over [its] message." *Id.* at 576.

{45}     In contrast to *Pacific Gas* and *Tornillo*, the United States Supreme Court has not found compelled speech violations where the government has not explicitly required a publisher to disseminate opposing points of view *and* where observers are unlikely to mistake a person's compliance with the law for endorsement of third-party messages, as in *Hurley*. In *Rumsfeld*, the United States Supreme Court rejected not only the law schools' argument that they were forced to speak the government's message, but also their argument that they were required to host the recruiters' speech in such a way that violated compelled speech principles. 547 U.S. at 64-65 ("[The law schools'] accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school."). The law schools in *Rumsfeld* worried that "treat[ing] military and nonmilitary recruiters alike . . . could be viewed as sending the message that they see nothing wrong with the military's policies [regarding gays in the military], when they do." *Id.* The *Rumsfeld* Court held that students "can appreciate the difference between speech a school sponsors and speech the school permits because legally required to do so," and that the law schools were free to express their disagreement with the military's policy. *Id.* at 65.

{46}     *Rumsfeld* drew on earlier cases that had considered whether observers would conflate the speech of third parties with the opinions of the parties to the suit. In *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 76-78 (1980), a California shopping center was sued under a California constitutional provision that required privately owned shopping centers to allow individuals to engage in expressive activities on their premises. The

16

shopping center argued that the state could not constitutionally compel it "to participate in the dissemination of an ideological message." *Id.* at 86-87. The United States Supreme Court rejected the argument, *id.* at 88, holding that because the shopping center was a business establishment that was open to the public, "[t]he views expressed by members of the public in passing out pamphlets or seeking signatures for a petition . . . will not likely be identified with those of the owner." *Id.* at 87. The Court also noted that the government had not dictated any particular message or engaged in viewpoint discrimination and that the shopping center could disavow the third-party messages by posting its own signs. *Id.* "Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law." *Id.*

**{47}** Elane Photography makes an argument very similar to one rejected by the *Rumsfeld* Court: by treating customers alike, regardless of whether they are having same-sex or opposite-sex weddings, Elane Photography is concerned that it will send the message that it sees nothing wrong with same-sex marriage. Reasonable observers are unlikely to interpret Elane Photography's photographs as an endorsement of the photographed events. It is well known to the public that wedding photographers are hired by paying customers and that a photographer may not share the happy couple's views on issues ranging from the minor (the color scheme, the hors d'oeuvres) to the decidedly major (the religious service, the choice of bride or groom). As in *Rumsfeld* and *PruneYard*, Elane Photography is free to disavow, implicitly or explicitly, any messages that it believes the photographs convey. We note that after *Rumsfeld*, many law schools published open letters expressing their continued opposition to military policies and military recruitment on campus. *See, e.g.*, Dean's Letter Regarding Military Recruiting on Campus & Faculty Letter Regarding Military Recruitment, Columbia Law School, http://web.law.columbia.edu/careers/military-recruiting-on-campus (last visited Aug. 9, 2013); Military Recruitment Policy, University of Dayton School of Law, http://www.udayton.edu/law/career_services/military_recruitment_policy.php (last visited Aug. 9, 2013); Employer Recruiting Policies and Guidelines, Harvard Law School, http://www.law.harvard.edu/current/careers/ocs/employers/recruiting-policies-employers/index.html#Non-Discrimination (last visited Aug. 9, 2013). Elane Photography and its owners likewise retain their First Amendment rights to express their religious and political beliefs. They may, for example, post a disclaimer on their website or in their studio advertising that they oppose same-sex marriage but that they comply with applicable antidiscrimination laws.

**c.** ***Elane Photography's allocation of its work time does not raise First Amendment concerns***

**{48}** Elane Photography next argues that when its employees spend time taking and editing photographs of same-sex weddings, they have less time to spend doing their preferred work of photographing opposite-sex weddings. Therefore, by Elane Photography's reasoning, the state has interfered with Elane Photography's message, just as it did in *Pacific Gas* and *Tornillo*. In *Tornillo*, the newspaper had limited space to print its stories, and

17

printing replies by politicians took up space in which the newspaper could have published other material. 418 U.S. at 256-57. Similarly, the utility in *Pacific Gas* was required to share the space inside its billing envelopes; when a third party used the space, the utility could not distribute its own newsletter without paying additional postage. 475 U.S. at 5-6 (plurality opinion). The instant case is different because Elane Photography does not produce a publication whose limited space has been taken over by the government.

{49} Instead, Elane Photography's complaint is based on its staff's limited time. Elane Photography argues that if it accepts same-sex couples as clients, its employees must "spend a day shooting pictures and three to four weeks selecting, editing, and arranging images" of the clients' weddings, when they would prefer to spend this time working on images of heterosexual weddings. Therefore, it argues, the NMHRA interferes with Elane Photography's own speech.

{50} We disagree because the allocation of work time is a matter of personal preference, not compelled speech, and it is not constitutionally protected. *See Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964) (rejecting Thirteenth Amendment challenge to law requiring motel to serve African-American guests). By their nature, laws prohibiting discrimination in public accommodations require businesses and their employees to spend time and energy serving customers whom they might prefer not to serve. *See Hurley*, 515 U.S. at 578 (describing common law public accommodation rules as guaranteeing that individuals "will not be turned away merely on the proprietor's exercise of personal preference"). These laws apply even when the businesses provide skillful or physically intimate services. *See Bragdon v. Abbott*, 524 U.S. 624, 628-29 (1998) (applying public accommodations provisions of the Americans with Disabilities Act to dental practice). This is the purpose of antidiscrimination laws: they force businesses to treat customers alike, regardless of their race, religion, or other protected status. These laws are necessary precisely because some businesses would otherwise refuse to work with certain customers whom the laws protect.

{51} Antidiscrimination laws have been consistently upheld as constitutional. *See, e.g.*, *Hurley*, 515 U.S. at 572 ("[Public accommodations laws] do not, as a general matter, violate the First or Fourteenth Amendments."); *Heart of Atlanta Motel*, 379 U.S. at 242-44, 258, 261 (sustaining Title II of the Civil Rights Act of 1964 against challenges based on the Commerce Clause and the Fifth and Thirteenth Amendments). Elane Photography's desire to work with heterosexual rather than homosexual couples does not give it license to violate the NMHRA.

3.     **There is no exemption from antidiscrimination laws for creative or expressive professions**

{52} There are no cases from either New Mexico jurisprudence or that of the United States Supreme Court that would compel a conclusion that the NMHRA violates Elane Photography's freedom of speech because it is engaged in a creative and expressive

18

profession. We decline to draw the line between "creative" or "expressive" professions and all others. While individuals in such professions undoubtedly engage in speech, and sometimes even create speech for others as part of their services, there is no precedent to suggest that First Amendment protections allow such individuals or businesses to violate antidiscrimination laws. The wedding industry in particular employs a variety of professionals who offer their services to the public and whose work involves significant skills and creativity. For example, a flower shop is not intuitively "expressive," but florists use artistic skills and training to design and construct floral displays. Bakeries also offer services for hire, and wedding cakes are famously intricate and artistic. Courts cannot be in the business of deciding which businesses are sufficiently artistic to warrant exemptions from antidiscrimination laws. These suggestions are not idle hypotheticals: we take judicial notice of a variety of situations in which florists, bakeries, and other wedding vendors have refused to serve same-sex couples. *See, e.g.*, Lee Moran, *Baker refuses to make wedding cake for lesbian couple*, N.Y. Daily News (Feb. 4, 2013), http://www.nydailynews.com/news/national/baker-refuses-wedding-cake-lesbian-couple-article-1.1254776; Annette Cary, *Arlene's Flowers in Richland sued by gay couple*, Tri-City Herald (Apr. 18, 2013), http://www.tri-cityherald.com/2013/04/18/2361691/arlenes-flowers-in-richland-sued.html (quoting a florist as objecting to "using her time and *artistic talent* to support an event . . . that she believes is wrong" (emphasis added)); *see also Cervelli v. Aloha Bed & Breakfast*, Civ. No. 11-1-3103-12 ECN, Order (Haw. Circ. Court 1st Cir. Apr. 15, 2013) www.lambdalegal.org/sites/default/files/2013-04-15_-_cervelli_order.pdf (finding that a bed and breakfast violated Hawaii's public accommodation law when it refused service to a same-sex couple and granting partial summary judgment for declaratory and injunctive relief).

**{53}** We are persuaded by cases suggesting that the First Amendment does not exempt creative or expressive businesses from antidiscrimination laws. In *Hishon v. King & Spalding*, 467 U.S. 69, 71-73 (1984), the United States Supreme Court reversed the dismissal of a Title VII employment discrimination complaint against the law firm of King & Spalding. In doing so, the Court rejected the firm's argument that by applying antidiscrimination laws to the firm's selection of its partners, the government "would infringe [First Amendment] constitutional rights of expression or association." *Id.* at 78. The Court held that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Id.* (alteration in original) (internal quotation marks and citation omitted). Legal work unquestionably involves creative and expressive skill and effort, but antidiscrimination laws still govern how a law firm runs its business.

**{54}** Elane Photography attempts to distinguish *King & Spalding* by arguing that the type of compelled-speech claim Elane Photography advances should apply only to public accommodations law because such an exemption "would protect a firm's decision not to advocate an argument that its partners cannot in good conscience advance." However, this

19

decision would already be protected under New Mexico law. The NMHRA does not prohibit a law firm, even one that is a public accommodation, from turning away clients with whose views the firm disagrees or with whom it simply does not wish to work. *See* § 28-1-7(F) (prohibited grounds do not include ideology or personal dislike). What the NMHRA forbids, and what Elane Photography's proposed exception would allow, is for a law firm to turn away a client because the firm finds the client offensive on the basis of a protected classification. Accepting Elane Photography's argument would exempt from antidiscrimination laws any business that provided a creative or expressive service. Such an exemption would not be limited to religious objections or to sexual orientation discrimination; it would allow any business in a creative or expressive field to refuse service on any protected basis, including race, national origin, religion, sex, or disability.

**{55}** Elane Photography also suggests that enforcing the NMHRA against it would mean that an African-American photographer could not legally refuse to photograph a Ku Klux Klan rally. This hypothetical suffers from the reality that political views and political group membership, including membership in the Klan, are not protected categories under the NMHRA. *See* § 28-1-7(F) (prohibiting public accommodation discrimination based on "race, religion, color, national origin, ancestry, sex, sexual orientation, gender identity, spousal affiliation or physical or mental handicap"). Therefore, an African-American could decline to photograph a Ku Klux Klan rally. However, the point is well-taken when the roles in the hypothetical are reversed—a Ku Klux Klan member who operates a photography business as a public accommodation would be compelled to photograph an African-American under the NMHRA. This result is required by the NMHRA, which seeks to promote equal rights and access to public accommodations by prohibiting discrimination based on certain specified protected classifications.

**{56}** However, adoption of Elane Photography's argument *would* allow a photographer who was a Klan member to refuse to photograph an African-American customer's wedding, graduation, newborn child, or other event if the photographer felt that the photographs would cast African-Americans in a positive light or be interpreted as the photographer's endorsement of African-Americans. A holding that the First Amendment mandates an exception to public accommodations laws for commercial photographers would license commercial photographers to freely discriminate against any protected class on the basis that the photographer was only exercising his or her right not to express a viewpoint with which he or she disagrees. Such a holding would undermine all of the protections provided by antidiscrimination laws.

**{57}** In short, we conclude that the NMHRA's prohibition on sexual-orientation discrimination does not violate Elane Photography's First Amendment right to refrain from speaking. The government has not required Elane Photography to promote the government's message, nor has the government required Elane Photography to facilitate third parties' messages, *except* to the extent that Elane Photography already facilitates third parties' messages, for hire, as part of the services that it offers as a for-profit public accommodation. Even if the services it offers are creative or expressive, Elane Photography must offer its

20

services to customers without regard for the customers' race, sex, sexual orientation, or other protected classification.

**B.     THE NMHRA DOES NOT VIOLATE ELANE PHOTOGRAPHY'S FIRST AMENDMENT FREE EXERCISE RIGHTS**

**{58}**     Elane Photography argues that enforcement of the NMHRA against it for refusing to photograph Willock's wedding violates its First Amendment right to freely exercise its religion. *See* U.S. Const. amend. I (Congress shall make no law prohibiting the free exercise of religion).

**{59}**     It is an open question whether Elane Photography, which is a limited liability company rather than a natural person, has First Amendment free exercise rights. Several federal courts have recently addressed this question with differing outcomes. *Compare, e.g.*, *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, slip op. at 11, ___ F.3d ___, ___ (3d Cir. July 26, 2013, No. 13-1144) ("[W]e conclude that for-profit, secular corporations cannot engage in religious exercise . . . ."), *with Grote v. Sebelius*, 708 F.3d 850, 854 (7th Cir. 2013) ("[T]he [plaintiffs'] use of the corporate form is not dispositive of the [free exercise] claim."). However, it is not necessary for this Court to address whether Elane Photography has a constitutionally protected right to exercise its religion. Assuming that Elane Photography has such rights, they are not offended by enforcement of the NMHRA.

**{60}**     Under established law, "the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks and citation omitted).[3] In order to state a valid First Amendment free exercise claim, a party must show either (a) that the law in question is not a "neutral law of general applicability," *id.* (internal quotation marks and citation omitted) or (b) that the challenge implicates both the Free Exercise Clause and an independent constitutional protection, *id.* at 881, or possibly (c) that the law operates "in a context that len[ds] itself to individualized government assessment of the reasons for the relevant conduct." *Id.* at 884. Elane Photography does not claim that the individualized assessment situation is applicable to the present case. We address its claims under the other two categories below.

---

[3]Congress attempted to overrule *Smith* by passing the Religious Freedom Restoration Act of 1993 (USRFRA), 42 U.S.C. §§ 2000bb (2006). However, the application of the USRFRA to state and local laws was held unconstitutional in *City of Boerne v. Flores*, 521 U.S. 507, 511, 519 (1997). The *Smith* standard continues to be good law for evaluating federal free exercise challenges to state actions. *See Christian Legal Soc'y*, ___ U.S. at ___ n.24, ___ n.27, 130 S. Ct. at 2993 n.24, 2995 n.27 (applying *Smith* standard).

## 1.     The NMHRA is a neutral law of general applicability

**{61}**     The United States Supreme Court elaborated on the rule concerning "law that is neutral and of general applicability" in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531, 546 (1993).  A law is not neutral "if [its] object . . . is to infringe upon or restrict practices because of their religious motivation."  *Id.* at 533.  It is not generally applicable if it "impose[s] burdens only on conduct motivated by religious belief" while permitting exceptions for secular conduct or for favored religions.  *Id.* at 543.  These inquiries are related, *id.* at 531; the Court observed that improper intent could be inferred if the law was a " 'religious gerrymander' " that burdened religion but exempted similar secular activity.  *Id.* at 534-35.  If a law is neither neutral nor generally applicable, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest."  *Id.* at 531-32; *see also id.* at 546 ("The compelling interest standard that we apply once a law fails to meet the *Smith* requirements is not water[ed] . . . down but really means what it says." (internal quotation marks and citation omitted)).

**{62}**     In *Lukumi Babalu Aye*, the city of Hialeah had passed several ordinances that prohibited religious sacrifice of animals but exempted secular slaughterhouses, kosher slaughterhouses, hunting, fishing, euthanasia of unwanted animals, and extermination of pests.  *Id.* at 526-28, 536, 543-44.  The Court held that this was a "religious gerrymander," *id.* at 535, the result of which was "that few if any killings of animals [were] prohibited other than Santeria sacrifice," *id.* at 536.  The Court concluded that "[t]he ordinances had as their object the suppression of religion" and were therefore nonneutral.  *Id.* at 542.  The Court then examined whether the ordinances were generally applicable and whether the government was selectively burdening only religiously motivated conduct.  *Id.* at 542-43.  The Court did not precisely define the standard for assessing general applicability, but it did observe that the Hialeah ordinances were grossly under-inclusive with respect to the laws' stated goals, *id.* at 543-45, and it concluded that the laws burdened "only . . . conduct motivated by religious belief."  *Id.* at 545.  The Court applied strict scrutiny to the ordinances and found them unconstitutional.  *Id.* at 546-47.

**{63}**     Elane Photography argues that the NMHRA is not generally applicable and that this Court therefore should apply strict scrutiny to the application of the NMHRA to Elane Photography.  Elane Photography identifies several exemptions from the antidiscrimination provisions of the NMHRA and argues that these exemptions make it not generally applicable.  Specifically, Elane Photography points to Section 28-1-9(A)(1), which exempts sales or rentals of single-family homes if the owner does not own more than three houses,[4] and Section 28-1-9(D), which exempts owners who live in small multi-family dwellings and rent out the other units.  Elane Photography argues that these exemptions, like those in

---

[4]The owner also may not engage in discriminatory advertising.  Section 28-1-9(A).  In addition, if the seller was not the most recent occupant of the house, he or she is exempt from the NMHRA for only one sale per twenty-four month period.  Section 28-1-9(A)(2).

*Lukumi Babalu Aye*, "impermissibly prefer the secular to the religious."

**{64}** This is a misreading of Section 28-1-9. Unlike the exemptions in *Lukumi Babalu Aye*, the exemptions in Section 28-1-9(A) and (D) apply equally to religious and secular conduct. Neither subsection discusses motivation; homeowners who meet the criteria of Section 28-1-9(A) and (D) are permitted to discriminate regardless of whether they do so on religious or nonreligious grounds. Therefore, the NMHRA does not target only religiously motivated discrimination, and these exemptions do not prevent the NMHRA from being generally applicable. These exemptions also do not indicate any animus toward religion by the Legislature that might render the law nonneutral; similar exemptions commonly appear in housing discrimination laws, including the federal Fair Housing Act. *See* 42 U.S.C. § 3603(b)(1) & (2) (2012) (exempting from compliance "any single-family house sold or rented by an owner," provided such "owner does not own more than three such . . . houses" and subject to additional limitations, and also exempting "rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his [or her] residence").

**{65}** Elane Photography also argues that the exemptions to the NMHRA for religious organizations undercut the purpose of the statute. In particular, Elane Photography highlights Section 28-1-9(B) and (C), which in its reading permits religious organizations to "decline same-sex couples as customers."

**{66}** Once again, Elane Photography's interpretation rests on a distorted reading of the statute. Section 28-1-9(B) allows religious organizations to "limit[] admission to or giv[e] preference to persons of the same religion or denomination or [to make] selections of buyers, lessees or tenants" that promote the organization's religious principles. In the context of "buyers, lessees or tenants," "buyers" clearly refers to purchasers of real estate rather than retail customers. *Id.* Subsection (C) exempts religious organizations from provisions of the NMHRA governing sexual orientation and gender identity, but only regarding "employment or renting." If a religious organization sold goods or services to the general public, neither subsection would allow the organization to turn away same-sex couples while catering to opposite-sex couples of all faiths. Subsection (B) permits religious organizations to serve only or primarily people of their own faith, as well as to discriminate in certain limited real estate transactions; Subsection (C) applies only to employment and, again, to real estate.

**{67}** In other words, neither of the religious exemptions in Section 28-1-9 would permit a religious organization to take the actions that Elane Photography did in this case. Furthermore, these exemptions do not prevent the NMHRA from being generally applicable. Exemptions for religious organizations are common in a wide variety of laws, and they reflect the attempts of the Legislature to respect free exercise rights by reducing legal burdens on religion. *See, e.g.*, *Hobbie v. Unemp't Appeals Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) (observing that the United States Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices" and listing

23

examples). Such exemptions are generally permissible, *see Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 329-30 (1987) (upholding religious exemption to Title VII of the Civil Rights Act of 1964 against an Establishment Clause challenge), and in some situations they may be constitutionally mandated, *see Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, ___ U.S. ___, ___, 132 S. Ct. 694, 705-06 (2012) (holding that the First Amendment precludes the application of employment discrimination laws to disputes between religious organizations and their ministers).

**{68}** The exemptions in the NMHRA are ordinary exemptions for religious organizations and for certain limited employment and real-estate transactions. The exemptions do not prefer secular conduct over religious conduct or evince any hostility toward religion. We hold that the NMHRA is a neutral law of general applicability, and as such it does not offend the Free Exercise Clause of the First Amendment.

**2.      Elane Photography has not adequately briefed its hybrid rights claim**

**{69}** In *Smith*, the United States Supreme Court left open the possibility that a neutral law of general applicability could nevertheless be unconstitutional if the law infringed both free exercise rights and an independent constitutional protection. 494 U.S. at 881. The Court recognized that in pre-*Smith* cases, it had sometimes applied more rigorous scrutiny to neutral, generally applicable laws. *Id.* The Court distinguished those cases by characterizing them not as simple free exercise cases, but as "hybrid situation[s]," *id.* at 882, in which the free exercise claims were raised "in conjunction with other constitutional protections, such as freedom of speech and of the press." *Id.* at 881. Elane Photography mentions that because it raised both a free exercise claim and a compelled-speech claim, it has made a hybrid-rights claim under which the NMHRA should receive strict scrutiny.

**{70}** This Court requires that the parties adequately brief all appellate issues to include an argument, the standard of review, and citations to authorities for each issue presented. *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("[T]o present an issue on appeal for review, an appellant must submit argument and authority as required by rule." (emphasis omitted)). "We will not review unclear arguments, or guess at what [a party's] arguments might be." *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076. To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the parties' work for them. *See State v. Clifford*, 1994-NMSC-048, ¶ 19, 117 N.M. 508, 873 P.2d 254 ("We remind counsel that we are not required to do their research . . . ."). This creates a strain on judicial resources and a substantial risk of error. It is of no benefit either to the parties or to future litigants for this Court to promulgate case law based on our own speculation rather than the parties' carefully considered arguments.

**{71}** Elane Photography devotes a single three-sentence paragraph to its hybrid-rights claim, stating that a hybrid claim exists because it has raised a compelled-speech claim and

24

a free exercise claim under the NMRFRA. However, as discussed in this opinion, neither of these claims is independently viable, and Elane Photography offers no analysis to explain why the two claims together should be greater than the sum of their parts. Elane Photography cites two cases, *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), and *Health Services Division, Health & Environment Dep't v. Temple Baptist Church*, 1991-NMCA-055, 112 N.M. 262, 814 P.2d 130, but provides no explanation of how or why we should apply these precedents to the facts of this case. As a matter of New Mexico law, Elane Photography's briefing of its hybrid-rights claim is inadequate to permit us to review the issue. For this reason, we do not consider its hybrid-rights argument.

## III.     ENFORCEMENT OF THE NMHRA DOES NOT VIOLATE THE NMRFRA BECAUSE THE NMRFRA IS NOT APPLICABLE IN A SUIT BETWEEN PRIVATE PARTIES

**{72}**    Finally, Elane Photography argues that the Commission's enforcement of the NMHRA against it violates the New Mexico Religious Freedom Restoration Act. The NMRFRA provides:

> A government agency shall not restrict a person's free exercise of religion unless:
>
> A.     the restriction is in the form of a rule of general applicability and does not directly discriminate against religion or among religions; and
>
> B.     the application of the restriction to the person is essential to further a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.

Section 28-22-3. "Free exercise of religion" is defined as "an act or a refusal to act that is substantially motivated by religious belief." Section 28-22-2(A).

**{73}**    Willock argues, and the Court of Appeals held, that the NMRFRA did not protect Elane Photography's refusal to photograph Willock's wedding, even though the refusal was religiously motivated, because the NMRFRA "was not meant to apply in suits between private litigants." *Elane Photography*, 2012-NMCA-086, ¶ 46. There is no other case law on this point in New Mexico; the Court of Appeals relied on federal cases interpreting the federal Religious Freedom Restoration Act. *Id.* ¶¶ 46-47.

**{74}**    The NMRFRA states that "[a] person whose free exercise of religion has been restricted by a violation of the New Mexico Religious Freedom Restoration Act may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government agency*." Section 28-22-4(A) (emphasis added). Elane Photography argues that the phrase "against a government agency" modifies "appropriate relief," rather than "a judicial proceeding." In other words, Elane Photography argues that although the

relief available is limited, the NMRFRA can be invoked even when the government is not a party.

**{75}** However, the statute is violated only if a "government agency" restricts a person's free exercise of religion. Section 28-22-3. A "government agency" includes "the state or any of its political subdivisions, institutions, departments, agencies, commissions, committees, boards, councils, bureaus or authorities." Section 28-22-2(B). The list of government agencies does *not* include the Legislature or the courts. It could be expected that the Legislature would have included itself and the courts in Section 28-22-2(B) if it meant the NMRFRA to apply in common-law disputes or private enforcement actions. Instead, the examples of government agencies are exclusively administrative or executive entities.

**{76}** Moreover, the structure of the NMRFRA as a whole suggests that the Legislature contemplated that the statute would apply only to legal actions in which the government was a party. The only relief authorized by the statute is "injunctive or declaratory relief against a government agency," § 28-22-4(A)(1), or "damages pursuant to the Tort Claims Act" with attorneys' fees and costs, § 28-22-4(A)(2). Nowhere does the NMRFRA authorize damages or injunctive relief against a non-governmental party.

**{77}** Elane Photography argues that because Willock's suit was adjudicated by the New Mexico Human Rights Commission, which is presumably a "government agency" for purposes of Section 28-22-2(B), the Commission's decision against it qualifies as a restriction of its free exercise of religion. However, Elane Photography appealed the Commission's determination to a New Mexico district court for a trial de novo pursuant to Section 28-1-13(A). The instant appeal concerns the district court's grant of summary judgment for Willock; the Commission is not a party to this case, and its order no longer has any legal effect. *See* § 39-3-1 (stating that appeals to the district court for trials de novo "shall be tried anew . . . as if no trial had been had below"). Willock argues, and we agree, that the Commission acted merely as an administrative tribunal to decide the dispute between Elane Photography and herself. The government's adjudication of disputes between private parties does not constitute government restriction of a party's free exercise rights for purposes of the NMRFRA.

**{78}** For the reasons stated above, we hold that as a matter of New Mexico law, the New Mexico Religious Freedom Restoration Act is inapplicable to disputes in which a government agency is not a party.

**CONCLUSION**

**{79}** Elane Photography's refusal to serve Vanessa Willock violated the New Mexico Human Rights Act, which prohibits a public accommodation from refusing to offer its services to a person based on that person's sexual orientation. Enforcing the NMHRA against Elane Photography does not violate the Free Speech or the Free Exercise clause of the First Amendment or the NMRFRA. For these reasons, we affirm the grant of summary

26

judgment in Willock's favor.

**{80}** **IT IS SO ORDERED.**

_____

**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____

**PETRA JIMENEZ MAES, Chief Justice**

_____

**CHARLES W. DANIELS, Justice**

_____

**BARBARA J. VIGIL, Justice**

**RICHARD C. BOSSON, Justice, specially concurring**

**BOSSON, Justice, specially concurring.**

**{81}** In 1943 during the darkest days of World War II, the State of West Virginia required students to salute the American flag and decreed that refusal to salute would "be regarded an Act of insubordination" which could lead to expulsion for the student and criminal action against the parent. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 626-29 (1943). Some students refused to salute, believing as Jehovah's Witnesses "that the obligation imposed by law of God is superior to that of laws enacted by temporal government." *Id.* at 629. They looked for authority in the Bible, Book of Exodus, Chapter 20, verses 4 and 5: "Thou shalt not make unto thee any graven image, or any likeness of anything that is in heaven above, or that is in the earth beneath, or that is in the water under the earth: thou shalt not bow down thyself to them, nor serve them." *Id.* (internal quotation marks omitted). Jehovah's Witnesses considered "the flag is an 'image' within this command," which they were bound by God not to salute. *Id.*

**{82}** In a ringing endorsement of the First Amendment, the United States Supreme Court struck down the West Virginia statute, noting the irony of the state's position: "To sustain the compulsory flag salute we are required to say that a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *Id.* at 634. And again, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.* at 642. In his concurrence, Justice Black had this to add:

27

> The Jehovah's Witnesses, without any desire to show disrespect for either the flag or the country, interpret the Bible as commanding, at the risk of God's displeasure, that they not go through the form of a pledge of allegiance to any flag. The devoutness of their belief is evidenced by their willingness to suffer persecution and punishment, rather than make the pledge.

*Id.* at 643 (Black, J., concurring). Considering the times, the *Barnette* opinion stands today as an act of the utmost courage; it represents one of the Court's finest moments.

**{83}**    Jonathan and Elaine Huguenin see themselves in much the same position as the students in *Barnette*. As devout, practicing Christians, they believe, as a matter of faith, that certain commands of the Bible are not left open to secular interpretation; they are meant to be obeyed. Among those commands, according to the Huguenins, is an injunction against same-sex marriage. On the record before us, no one has questioned the Huguenin's devoutness or their sincerity; their religious convictions deserve our respect. In the words of their legal counsel, the Huguenins "believed that creating photographs telling the story of that event [a same-sex wedding] would express a message contrary to their sincerely held beliefs, and that doing so would disobey God." If honoring same-sex marriage would so conflict with their fundamental religious tenets, no less than the Jehovah's Witnesses in *Barnette*, how then, they ask, can the State of New Mexico compel them to "disobey God" in this case? How indeed?

**{84}**    Twenty-four years later, during the zenith of the Civil Rights era, the Supreme Court provided a partial answer. In *Loving v. Virginia*, the State of Virginia, like sixteen similarly situated states with miscegenation laws, prohibited marriage between the white and black races, making it a crime punishable by imprisonment. 388 U.S. 1, 4, 6 (1967). Such laws arose as an incident of slavery and were common in Virginia and elsewhere since early times. *Id.* at 6. The Lovings, an interracial couple, had been lawfully married elsewhere and wanted to live openly as husband and wife in Virginia. *Id.* at 2-3. For their honesty, they were prosecuted and convicted; their prison sentences were suspended on condition that they leave Virginia and not return for 25 years. *Id.* at 3. The Virginia trial judge, in justifying the convictions, drew strength from his view of the Bible:

> "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. And but for the interference with this arrangement there would be no cause for such marriages. The fact that he separated the races shows that he did not intend for the races to mix."

*Id.* at 3. Whatever opinion one might have of the trial judge's religious views, which mirrored those of millions of Americans of the time, no one questioned his sincerity either or his religious conviction. In affirming the Lovings' convictions, Virginia's highest court observed the religious, cultural, historical, and moral roots that justified miscegenation laws. *See id.*

**{85}** The Supreme Court struck down Virginia's miscegenation statute. *Id.* at 11-12. Observing that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential in the orderly pursuit of happiness by free men," the Court held categorically that "[t]here can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause." *Id.* at 12. State laws, even those religiously inspired, may not discriminate invidiously on the basis of race.

**{86}** There is a lesson here. In a constitutional form of government, personal, religious, and moral beliefs, when *acted upon* to the detriment of someone else's rights, have constitutional limits. One is free to believe, think, and speak as one's conscience, or God, dictates. But when actions, even religiously inspired, conflict with other constitutionally protected rights—in *Loving* the right to be free from invidious racial discrimination—then there must be some accommodation. Recall that *Barnette* was all about the students; their exercise of First Amendment rights did not infringe upon anyone else. The Huguenins cannot make that claim. Their refusal to do business with the same-sex couple in this case, no matter how religiously inspired, was an affront to the legal rights of that couple, the right granted them under New Mexico law to engage in the commercial marketplace free from discrimination.

**{87}** But of course, the Huguenins are not trying to prohibit anyone from marrying. They only want to be left alone to conduct their photography business in a manner consistent with their moral convictions. In their view, they seek only the freedom *not* to endorse someone else's lifestyle. *Loving*, therefore, does not completely answer the question the Huguenins pose. To complete the circle, we turn to our third case.

**{88}** *Heart of Atlanta Motel, Inc. v. United States*, upheld the federal Civil Rights Act of 1964, a milestone enactment which, among other achievements, declared invidious discrimination unlawful, not just by the state but by private citizens, when providing goods and services in the sphere of public accommodations. 379 U.S. 241, 246, 261-62 (1964). The Act declared: "'All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion or national origin.'" *Id.* at 247. A watershed achievement, the Act vindicated nearly a century of frustrated effort to fulfill the promise of the Fourteenth Amendment, to end not only slavery but all of its traces as well. *See id.* at 244-46. And ending second-class citizenship, being denied a seat in a restaurant or a room in an inn—purely on the basis of one's race or religion—was a goal that drove the passage of the Act. *See id.* at 252-53.

**{89}** By the time of the success of the Civil Rights Act of 1964, many states had already passed their own public accommodation laws. *See id.* at 358-59 (noting that thirty-two states already had public accommodation laws); *see also* Lisa Gabrielle & Annette K. Sanderson, *Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws*, 7 N.Y.U. Rev. L. & Soc. Change 215, 240 (1978) (recognizing that

"the existence of numerous state laws facilitated Congress' acceptance of Title II" of the Civil Rights Act). Today, many states have Human Rights Acts similar to New Mexico's. *See, e.g.*, 775 Ill. Comp. Stat. Ann. 5/1-102(A) (2010); Iowa Code Ann. § 216.7 (2007); Md. Code Ann., State Government § 20-304 (2009); Nev. Rev. Stat. Ann. § 651.070 (2011). Public accommodations have been expanded to preclude invidious discrimination in most every public business, including the Huguenin's photography business. Prohibited classifications have been enlarged from the historical classes—race, religion, gender, national origin—to include sexual orientation. *See, e.g.,* Douglas NeJaime, *Marriage Inequality: Same-Sex Relationships, Religious Exemptions, and the Production of Sexual Orientation Discrimination*, 100 Cal. L. Rev. 1169, 1190 (2012) ("Twenty-one states and the District of Columbia cover sexual orientation in their antidiscrimination laws governing employment, housing, and public accommodations."). The New Mexico Legislature has made it clear that to discriminate in business on the basis of sexual orientation is just as intolerable as discrimination directed toward race, color, national origin, or religion. *See* NMSA 1978, § 28-1-7(F) (2004). The Huguenins today can no more turn away customers on the basis of sexual orientation—photographing a same-sex marriage ceremony—than they could refuse to photograph African-Americans or Muslims.

**{90}** All of which, I assume, is little comfort to the Huguenins, who now are compelled by law to compromise the very religious beliefs that inspire their lives. Though the rule of law requires it, the result is sobering. It will no doubt leave a tangible mark on the Huguenins and others of similar views.

**{91}** On a larger scale, this case provokes reflection on what this nation is all about, its promise of fairness, liberty, equality of opportunity, and justice. At its heart, this case teaches that at some point in our lives all of us must compromise, if only a little, to accommodate the contrasting values of others. A multicultural, pluralistic society, one of our nation's strengths, demands no less. The Huguenins are free to think, to say, to believe, as they wish; they may pray to the God of their choice and follow those commandments in their personal lives wherever they lead. The Constitution protects the Huguenins in that respect and much more. But there is a price, one that we all have to pay somewhere in our civic life.

**{92}** In the smaller, more focused world of the marketplace, of commerce, of public accommodation, the Huguenins have to channel their conduct, not their beliefs, so as to leave space for other Americans who believe something different. That compromise is part of the glue that holds us together as a nation, the tolerance that lubricates the varied moving parts of us as a people. That sense of respect we owe others, whether or not we believe as they do, illuminates this country, setting it apart from the discord that afflicts much of the rest of the world. In short, I would say to the Huguenins, with the utmost respect: it is the price of citizenship. I therefore concur.

**RICHARD C. BOSSON, Justice**

30

**Topic Index for** *Elane Photography, LLC v. Willock***, No. 33,6871**

**CIVIL RIGHTS**
Discrimination
Human Rights Act
Sexual Orientation Discrimination

**CONSTITUTIONAL LAW**
Freedom of Religion
Freedom of Speech