2002-NMCA-089

54 P.3d 79

**John L. MEYERS, Worker–Appellant,**

v.

**WESTERN AUTO and CNA Insurance Companies, Employer/Insurer–Appellees.**

No. 22,083.

Court of Appeals of New Mexico.

June 6, 2002.

Certiorari Denied, No. 27,579,
Aug. 12, 2002.

Gerald A. Hanrahan, Albuquerque, NM, for Appellant.

Kimberly A. Syra, Hatch, Allen & Shepherd, P.A., Albuquerque, NM, for Appellees.

## OPINION

CASTILLO, Judge.

{1} In this workers' compensation case, we address the consequences of bad faith handling of a worker's claim and the award of attorney fees. John L. Meyers (Worker) appeals from orders awarding him medical benefits and attorney fees, and imposing bad faith sanctions against Employer/Insurer Western Auto and CNA Insurance Companies (hereinafter collectively referred to as CNA). On appeal, Worker claims that: (1) the Workers' Compensation Judge (WCJ) should have included future medical benefits and attorney fees in calculating the bad faith sanction; (2) the statute imposing the sanction should not be the exclusive remedy available to a claimant; (3) the WCJ should have awarded additional sanctions for conduct that took place in proceedings before the Workers' Compensation Administration (WCA); (4) CNA should be responsible for payment of all of Worker's attorney fees; (5) Worker's present claim for the reinstatement of medical benefits should not have been treated as a part of his original claim for purposes of calculating the amount of attorney fees; and (6) the cap on attorney fees is unconstitutional. We affirm on all issues except the fourth issue, payment of attorney fees. Because Worker's total award was more than his settlement offer before the hearing, we hold that NMSA 1978, § 52-1-54(F)(4) (1993) requires CNA to pay all of Worker's attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} Worker suffered a back injury in November 1991 while employed with Western Auto in Hobbs, New Mexico. After Worker underwent surgery in December 1991, he relocated to Las Vegas, Nevada, where he was treated by Edson O. Parker, M.D. Dr. Parker reported that Worker reached maximum medical improvement in December 1992. Worker thereafter filed a complaint for benefits under the Workers' Compensation Act (Act). A compensation order filed in September 1994 resolved Worker's claim by awarding him permanent partial disability benefits and attorney fees in the amount of $5800. Worker continued to receive medical treatment pursuant to the Act.

{3} On September 11, 1998, Worker suffered injuries to his neck and right shoulder while performing maintenance for a Las Vegas property management company. Although these injuries were serious enough to require surgery, they did not affect Worker's pre-existing back injury. Worker was notified that he needed additional back surgery just five days after he suffered the injuries to his neck and shoulder. CNA initially denied authorization for back surgery, advising

Worker that he would first have to attend an independent medical exam (IME) with a panel of specialists in Albuquerque. The IME was scheduled for November 20, 1998. However, on November 17, 1998, an orthopedic specialist evaluated Worker's September 11 injuries and diagnosed them as a cervical strain and right shoulder impairment. The orthopedic specialist ordered a magnetic resonance imaging (MRI) scan and instructed Worker not to travel to Albuquerque until he stabilized. On November 17 or 18 Worker's wife informed CNA that Worker would be unable to travel to Albuquerque for the IME. In a letter dated December 3, 1998, a new CNA claims adjuster, Greg Ramirez, informed Worker that he was placing a hold on medical benefits because it appeared that Worker had suffered a separate injury, and worker had failed to submit to an IME as mandated by the Act. Worker's wife contacted Ramirez after receipt of the letter, and the IME was reset for December 18, 1998.

{4} On December 9, 1998, the MRI scan of Worker's back revealed cervical disc extrusion at the C3–4 level. Worker was referred to an orthopedic surgeon and restricted from flying to Albuquerque for at least six weeks. Worker underwent back surgery on December 17, 1998. Just prior to the surgery, Worker's wife informed Ramirez that the IME would have to be rescheduled once again. Ramirez told her that after December 31, 1998, CNA would terminate medical benefits until an IME report was received.

{5} On January 29, 1999, the surgeon who had operated on Worker in December 1998 released Worker to travel. CNA was notified of the release and the IME was scheduled for March 26, 1999. In the meantime, Worker informed his treating physician in Nevada, Dr. Parker, that Worker's benefits had been stopped. Dr. Parker wrote to Ramirez on February 4, 1999, informing him that Worker continued to need medical treatment for his back and that the back condition was not related to the neck and shoulder injuries sustained in September 1998. Dr. Parker urged CNA to reinstate Worker's medical benefits. Thereafter, Worker's wife called Ramirez and informed him that Worker's condition was deteriorating and that

Worker could not afford to pay for his medications. Ramirez told her that he did not need to respond to Dr. Parker's letter, and advised her that the benefits remained suspended until after the IME.

{6} In an effort to address his ongoing back pain, Worker underwent a selective nerve root block, performed by Dr. Parker on March 22, 1999. CNA denied payment for this procedure. On March 26, 1999, Worker attended his IME in Albuquerque, with Dr. Theodore Scharf acting as coordinator. The IME report recommended discontinuation of the pain medication oxycontin, to be replaced by methadone. The report also recommended against nerve blocks. By letter dated April 19, 1999, CNA, through Ramirez, notified Worker that his medical benefits would be limited to those authorized by the IME report. In response, Dr. Parker sent a letter dated April 29, 1999, to inform CNA that methadone had proved unsuccessful in treating Worker in the past, that oxycontin was effective and medically necessary, and that Worker had treatment needs beyond those recommended by the IME report. Ramirez did not respond to the letter and later informed Worker's wife that he would restrict benefits to the IME report recommendations unless otherwise authorized by Dr. Scharf.

{7} Worker brought this dispute to the WCA by filing an application for benefits on July 26, 1999. The WCJ referred the matter to mediation and ordered Dr. Sidney Schultz, a board certified orthopedic surgeon, to perform an IME. The IME report was issued on September 15, 1999. The report and Dr. Schultz's subsequent testimony in this case largely concurred with Dr. Parker's opinions on the use of oxycontin and need for on going pain management at Dr. Parker's discretion. Dr. Schultz also agreed that the injuries Worker sustained in September 1998 should not affect treatment for his back condition.

{8} Ramirez was no longer working for CNA by January 1, 2000. In late January, Worker's pharmacist attempted to contact Ramirez for authorization to fill Worker's prescriptions. First, the pharmacist was advised that Ramirez's voice mail was full; then he was advised that Ramirez was no longer

with CNA and directed to leave a message. The pharmacist still had not received authorization from CNA by the time of the hearing on Worker's benefit application in August 2000.

{9} Before the hearing, Worker made an offer to settle the claim, which CNA rejected. At the hearing, Ramirez essentially conceded that he had handled Worker's claim improperly and that it had been inappropriate to discontinue Worker's benefits in December 1998. After the hearing, the WCJ entered an order that had the effect of back-dating all medical benefits to December 1998, including most of Dr. Parker's treatments and prescription recommendations. The WCJ found that CNA had engaged in the following bad faith conduct:

> 46. ... by terminating medical benefits when Insurer knew the failure to appear for an independent medical examination was for medical reasons barring travel.
>
> 47. ... by refusing to investigate medical care claims in this cause, and by refusing to take reasonable steps to evaluate the new information.
>
> 48. ... by refusing to consider the effects of newly presented information relating to alternatives to oxycontin and by attempting to delegate decision making to a physician, Dr. Scharf, who had not been retained for that purpose.
>
> 49. ... by permitting the complete cessation of adjustment activity on this claim by its agents by mid-December, 1999 until February, 2000.
>
> 50. ... by failing to inform Worker and his medical providers of a change of adjusters for two months after it occurred, resulting in unreasonable delay in payment of just claims.
>
> 51. ... by unreasonably delaying payment of just claims relating to medical care.
>
> 52. ... by the failure of its agent, Greg Ramirez, to adequately review and become familiar with the contents of Insurer's own files and records relevant to Worker's medical claims, prior to refusals to pay or not pay medical claims.

> 53. ... by attempting to usurp control of medical care through the guise of an independent medical examination.
>
> 54. ... by attempting to regulate medical care consistent with a one time IME, and without regard to new information or changed circumstances.

{10} The WCJ additionally found that CNA "did not engage in bad faith in proceedings *before the Workers' Compensation Administration* to warrant further sanctions pursuant to 11 NMAC 4.4.13.2." The WCJ subsequently imposed the statutory twenty-five percent maximum sanction on CNA for its bad faith conduct, which amounted to $1674 of the roughly $6700 amount awarded for unpaid medical costs. The WCJ also awarded an attorney fee of $9000 plus tax. The WCJ found that the recovery could not be meaningfully compared to the offer because of materially different terms, and therefore refused to order CNA to pay all of Worker's attorney fees. This appeal ensued.

## DISCUSSION

### I. Interpreting the Bad Faith Statute

{11} The central issue in this appeal concerns the interpretation of the following portion of the Act's bad faith statute, NMSA 1978, § 52-1-28.1 (1990) (effective January 1, 1991):

> B. If unfair claim processing or bad faith has occurred in the handling of a particular claim, the claimant shall be awarded, in addition to any benefits due and owing, a benefit penalty not to exceed twenty-five percent of the benefit amount ordered to be paid.

{12} Worker contends that the WCJ should have calculated the "benefit amount ordered to be paid" based on three components: the amount awarded for unpaid medical expenses; the value of Worker's future medical benefits; and Worker's attorney fees. In support of his reading of the statute, Worker argues that the benefit penalty must be sufficient to enforce the public policy against bad faith handling of workers' compensation claims and in this case, unless all three factors are included, the penalty is so small "it should shock the conscience of this Court."

{13} Because we are construing the meaning of the statute, we apply a de novo standard of review. *See Ramirez v. IBP Prepared Foods,* 2001–NMCA–036, ¶ 10, 130 N.M. 559, 28 P.3d 1100 (stating that interpretation of a worker's compensation statute is a question of law to be reviewed de novo); *Valdez v. Wal–Mart Stores, Inc.,* 1998–NMCA–030, ¶ 16, 124 N.M. 655, 954 P.2d 87 (same). The appropriate calculation of benefits under Section 52–1–28.1(B) is an issue of first impression. When the wording of a statute is clear and unambiguous, we will give effect to the wording of the statute. *See Storey v. Univ. of N.M. Hosp./BCMC,* 105 N.M. 205, 207, 730 P.2d 1187, 1189 (1986) ("An unambiguous statute should be given effect according to its clear language."). We interpret statutes to give effect to all parts of the statute as a harmonious whole. *Montoya v. Mentor Corp.,* 1996–NMCA–067, ¶ 19, 122 N.M. 2, 919 P.2d 410; *Sec. Escrow Corp. v. N.M. Taxation & Revenue Dep't,* 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct.App.1988). We recognize, however, that review of the language of a statute is merely a starting point for interpreting its meaning and effect. *See Gutierrez v. City of Albuquerque,* 1998–NMSC–027, ¶ 23, n. 8, 125 N.M. 643, 964 P.2d 807 (cautioning against application of the plain meaning rule to the Act); *Chavez v. Mountain States Constructors,* 1996–NMSC–070, ¶ 25, 122 N.M. 579, 929 P.2d 971 (noting imprecision of the Act). In construing a statute, our goal is to give primary effect to the intent of the legislature. *Draper v. Mountain States Mut. Cas. Co.,* 116 N.M. 775, 777, 867 P.2d 1157, 1159 (1994). Accordingly, we consider Worker's arguments in light of the underlying purpose of the Act as well as its legislative history and case law development.

{14} We first address Worker's argument that future medical benefits should be included in the benefit amount calculation. Worker contends that CNA had effectively eliminated his lifetime medical benefits, which were restored by order of the WCJ. Therefore, according to Worker, future medical benefits were secured as a direct result of his complaint and their value should form a basis for the bad faith penalty. Worker downplays the speculative nature of future medical benefits by arguing that the amount could be determined either (1) annually, with a bad faith sanction imposed from the actual amount of medical expenses incurred; or (2) estimated, with a sanction imposed on the amount Worker should receive during his life span.

{15} While there is a question as to whether CNA actually eliminated all of Worker's future medical benefits, the resolution of this issue does not affect our holding. We first evaluate how future medical benefits are treated under the Act. It is well-established that the Act does not permit a present award based on future medical benefits. *Hales v. Van Cleave,* 78 N.M. 181, 185–86, 429 P.2d 379, 383–84 (Ct.App.1967). The unavailability of such an award is due to its speculative nature and the Act's alternative method for handling such benefits: requiring employers to furnish continued medical care, as mandated by NMSA 1978, § 52–1–49 (1990) (effective January 1, 1991). *Garcia v. Gen. Elec.,* 1999–NMCA–139, ¶ 15, 128 N.M. 291, 992 P.2d 304. In short, the Act replaces uncertain present valuation with employers' continued obligation to provide medical care for injured workers, and does not allow present awards based on future medical benefits. We continue our review of the Act to determine if bad faith penalties have unique characteristics that would take them out of this general rule.

{16} In 1990 the legislature enacted Section 52–1–28.1 in response to *Russell v. Protective Ins. Co.,* 107 N.M. 9, 12, 751 P.2d 693, 696 (1988). In *Russell,* the Supreme Court held that until the legislature directed otherwise, bad faith claims in a worker's compensation context could be brought in district court. Section 52–1–28.1 made bad faith claims subject to the exclusivity provision of the Act. *Id.; see* NMSA 1978, § 52–1–9 (1973). The principal case interpreting Section 52–1–28.1 is *Cruz v. Liberty Mutual Insurance Co.,* 119 N.M. 301, 304, 889 P.2d 1223, 1226 (1995). In evaluating the effect of this statute on bad faith claims, the Supreme Court specifically considered the size of the award available to Worker and stated:

Further, Section 52–1–28.1 provides an adequate remedy. The purpose of the bad-faith action in the Act is to secure benefits for the employee and penalize the employer or insurer. Under Section 52–1–28.1, the employee receives all compensation for benefits due and owing and "shall receive" an extra "benefit penalty" of up to twenty-five percent of the claim. Section 52–1–28.1(B). Although this penalty may not be a great amount when the amount of the claim is small, it provides sufficient deterrence to prevent an insurer from denying benefits in bad faith and enforces the public policy against the bad-faith handling of workers' compensation claims. In addition, although this Section may not provide a recovery for emotional distress or an award of punitive damages, we previously have held that "the employer or insurer's liability is limited to that set forth in the Act." *Dickson v. Mountain States Mut. Cas. Co.*, 98 N.M. 479, 481, 650 P.2d 1, 3 (1982) (barring recovery of emotional distress damages under the Act).

*Cruz*, 119 N.M. at 304, 889 P.2d at 1226.

■ {17} This language in *Cruz* undercuts Worker's argument in two respects. First, the amount of the award in this case does not "shock the conscience," as Worker contends. Instead, the amount of bad faith penalties available must be viewed in the context of the Act's overall compromise of securing benefits and limiting issues of liability and monetary awards. *See Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 22, 127 N.M. 47, 976 P.2d 999 (noting that in return for loss of accident-related tort claims, Act provides compensation to workers during recovery). Second, *Cruz* affirms the adequacy of awards under Section 52–1–28.1 even though emotional distress and punitive damages are no longer available. Additionally, Worker has not cited any decisions from other jurisdictions that would provide such generous bad faith benefits in a workers' compensation proceeding, and we have been unable to find any support for his position. *See generally* 8 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 135.01D (2001) (noting various approaches).

{18} Worker's claim that his bad faith penalty should reflect a percentage of all restored benefits, including future medical benefits, is the same argument that has been made and rejected in the attorney fees context. Consistent with the Act's prohibition against allowing a present (i.e., lump sum) award for future medical benefits, a worker's attorney fees award should not be calculated on a percentage of the projected value of these benefits. *See Bd. of Educ. v. Quintana*, 102 N.M. 433, 435, 697 P.2d 116, 118 (1985) (stating prohibition and that, similarly, future medical expenses should not be considered for purposes of determining attorney fees). As discussed in *Buckingham v. Health S. Rehab. Hosp.*, 1997–NMCA–127, ¶ 16, 124 N.M. 419, 952 P.2d 20, the legislature subsequently codified this prohibition. *See* Section 52–1–54(H) ("The value of future medical benefits shall not be considered in determining attorneys' fees."). In *Buckingham*, the majority opinion reiterated that an award of attorney fees may not be based on a valuation of future benefits. *Id.* ¶¶ 30–40. The majority agreed that the *value* of future benefits could never be used, although the fact that the benefits were secured could be considered as a factor in analyzing the propriety of the attorney fees award. *Id.* ¶¶ 35, 39; *see generally Fryar v. Johnsen*, 93 N.M. 485, 485–88, 601 P.2d 718, 718–21 (1979) (discussing methods for reviewing attorney fees award).

{19} Based on the foregoing, Worker's arguments fail. There is no basis for us to depart from the general rule that the value of future medical benefits cannot be used to calculate an award under the Act.

■ {20} In addition to the value of future medical benefits, Worker would have us add attorney fees in determining the sum of "benefit amount ordered to be paid" under Section 52–1–28.1(B). This we will not do: it is well-settled that attorney fees do not constitute compensation under the Act. *See Archuleta v. Safeway Stores, Inc.*, 104 N.M. 769, 774–75, 727 P.2d 77, 82–83 (Ct.App. 1986).

## II. Exclusivity of Section 52–1–28.1

{21} Worker challenges the holding of *Cruz* with respect to exclusivity and the adequacy of remedies available under Section 52–1–28.1. However, this Court does not have authority to overrule *Cruz. See Alexander v. Delgado*, 84 N.M. 717, 718, 507 P.2d 778, 779 (1973) (Supreme Court precedent controls).

## III. WCA Rules

{22} Worker claims that the WCJ should also have sanctioned CNA under WCA Rule 11 NMAC 4.4.13.2.4 (1996), which provides, in pertinent part: "The Judge may sanction any party, attorney, or representative thereof, for ... [e]ngaging in conduct before the WCA which amounts to bad faith or unfair claims processing." We affirm on this issue because none of the incidents of bad faith took place in proceedings "before" the WCA. The WCJ entered three separate orders in this case: the first was entitled "Compensation Order"; the second was an attorney fees order; and the third was an order with supplemental findings and conclusions regarding bad faith. Worker relies on the language contained in the attorney fees order stating that unfair claims practices had taken place. Worker argues that CNA's conduct was therefore a matter "before the WCA." We disagree with Worker's reading of the orders. In the compensation order, the WCJ specifically found that CNA "did not engage in bad faith in proceedings *before the Workers' Compensation Administration* to warrant further sanctions pursuant to 11 NMAC 4.4.13.2." Therefore, we decline to construe the reference to "unfair claims processing" contained in the subsequent attorney fees order as an implicit reconsideration of the WCJ's express finding in the compensation order. *Cf. Herrera v. Roman Catholic Church*, 112 N.M. 717, 721, 819 P.2d 264, 268 (Ct.App.1991) ("Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it.").

## IV. Payment of Attorney Fees

{23} Worker argues that CNA is responsible for the full amount of his attorney fees because the WCJ ultimately gave him more than Worker requested in his settlement offer prior to the August 2000 hearing. The WCJ made a specific finding that Worker failed to satisfy Section 52–1–54(F)(4) because "[t]he recovery here cannot be meaningfully compared to the offer because of materially different terms." Worker argues that the WCJ was referring to the bad faith penalty and the fact that it was not part of the original offer. CNA contends that the WCJ was correct because (1)Worker failed to recover the expenses listed in his offer; and (2) the bad faith penalty was not "an amount awarded by the compensation order" as specifically required by the statute. This issue raises a question of statutory interpretation, which we review de novo. *See Ramirez*, 2001–NMCA–036, ¶ 10, 130 N.M. 559, 28 P.3d 1100; *Valdez*, 1998–NMCA–030, ¶ 16, 124 N.M. 655, 954 P.2d 87.

{24} Section 52–1–54(F)(4) provides: "if the worker's offer was less than the amount awarded by the compensation order, the employer shall pay one hundred percent of the attorneys' fees to be paid the worker's attorney, and the worker shall be relieved from any responsibility for paying any portion of the worker's fees."[1] In construing a statute, our goal is to give primary effect to the intent of the legislature. *Draper*, 116 N.M. at 777, 867 P.2d at 1159. We look to the language of the statute to ascertain the legislative intent. *Id.* However, the intent of the legislature will prevail over a literal reading of the language. *Id.*

{25} The purpose of Section 52–1–54(F) is to encourage the parties to resolve their differences before hearing thus supporting the policy of judicial economy and allowing for more timely resolution of claims. CNA would like us to read the statute narrowly and limit the comparison of Worker's

---

1. Although the issue of attorney fees is governed by the law in effect at the time of the disability, we rely on language taken from the 1993 amendments to the Act. *Leo v. Cornucopia Rest.*, 118 N.M. 354, 361–62, 881 P.2d 714, 721–22 (Ct.App. 1994) (holding 1993 amendment corrected a mistake in the earlier version of the statute and should be substituted for the earlier version in determining legislative intent).

offer to the first order entered by the WCJ entitled "Compensation Order." Such a reading would frustrate the purpose of the Act. If a case goes to hearing, it is not uncommon to have several orders resolving a complaint and they are read together. We have reviewed all three of the WCJ's orders in this case. There is no doubt that the award of the benefit penalty was part of the total resolution of this case and the "compensation order" as contemplated by the statute consists of the three orders entered to reach that resolution. We interpret the term "compensation order" broadly to effect the purposes of the Act. *See Genuine Parts Co. v. Garcia,* 92 N.M. 57, 62, 582 P.2d 1270, 1275 (1978) (holding that fees awarded under the Act after trial or formal hearing are treated in New Mexico as part of the judgment proper); *Fasso v. Sierra Healthcare Ctr.,* 119 N.M. 132, 133–34, 888 P.2d 1014, 1015–16 (Ct.App.1994) (holding recommended resolution became binding compensation order); *Curliss v. B & C Auto Parts,* 116 N.M. 668, 670, 866 P.2d 396, 398 (Ct.App.1993) (treating lump-sum settlement agreement as compensation order for purposes of modification and review under NMSA 1978, § 52–5–9 (1989)).

{26} The remaining language in the statute requires a straightforward comparison: Did the worker ultimately get more than he asked for? Here, contrary to CNA's contention, the answer is clearly "yes" when the bad faith sanction is added. The WCJ essentially gave Worker everything contained in his offer with respect to medical benefits. Any difference between Worker's offer and the award less bad faith sanctions consisted of certain costs and expenses which, even under the method of calculation most favorable to CNA, were no more than $1500. Worker recovered a bad faith penalty of $1674.99, almost $175 more than the offer. Section 52–1–54(F)(4) does not require the WCJ to look into the elements of Worker's offer; it shifts the responsibility for payment of fees "if the worker's offer was less than the amount awarded by the compensation order." In this case, Worker's offer was less than the amount awarded by the compensation order and it makes no difference that the bad faith penalties were not contemplat-

ed at the time of the offer. We therefore reverse on this issue.

## V. Single Verses Separate Claim

{27} Worker argues that the 1990 amendments to the Act now allow for a new attorney fees cap for each "claim" instead of for each injury. However, as CNA correctly argues, Worker's reference to "single accidental injury claim" in Section 52–1–54(I) omits subsequent language in this section providing that each injury, and not each individual claim, is subject to the cap: "This limitation applies whether the claimant or employer has one or more attorneys representing him and applies as a cumulative limitation on compensation for all legal services rendered in all proceedings and other matters directly related to a single accidental injury to a claimant." Because Worker has not persuaded us that we should look beyond this plain language, we defer to the statute. *Draper,* 116 N.M. at 777, 867 P.2d at 1159.

## VI. Constitutionality of Attorney Fees Cap

{28} Worker's final challenge is to the constitutionality of the attorney fees cap in Section 52–1–54(I). In *Corn v. New Mexico Educators Federal Credit Union,* 119 N.M. 199, 207–08, 889 P.2d 234, 242–43 (Ct.App. 1994), *overruled by Trujillo v. City of Albuquerque,* 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305, this Court held that the statutory cap on attorney fees violated equal protection in the absence of restrictions on employers' legal fees. Although the Supreme Court in *Trujillo* overruled *Corn's* use of a heightened rational basis (or fourth-tiered) approach, it stated that it was confident the same result would be reached under a rational basis standard. *Trujillo,* 1998–NMSC–031, ¶ 32, 125 N.M. 721, 965 P.2d 305. However, as this Court observed in *Mieras v. Dyncorp,* 1996–NMCA–095, ¶ 23, 122 N.M. 401, 925 P.2d 518, the legislature remedied the constitutional infirmity addressed in *Corn* by amending Section 52–1–54(I) to make the cap applicable to both claimants and employers. In *Mieras,* 1996–NMCA–095, ¶¶ 16–34, 122 N.M. 401, 925 P.2d 518, we addressed at length whether any post-

amendment constitutional concerns remained and applied a rational-basis test, specifically bypassing the heightened rational basis tier criticized in *Trujillo*. *Mieras*, 1996–NMCA–095, ¶ 28, 122 N.M. 401, 925 P.2d 518. We concluded that the cap did not violate equal protection or due process.

 {29} Although certain language in the *Mieras* opinion suggests that a cap may be unconstitutional as applied in some circumstances, *id.* ¶ 34, neither the facts in *Mieras* nor the present case create those circumstances. In *Mieras*, the WCJ found that the value of the recovered death benefit was over $215,000 and awarded the statutory maximum attorney fee after specifically finding that a reasonable award would exceed the cap. *Id.* ¶¶ 17, 22. The WCJ also found that the value of the recovered death benefits was over $215,000. In this case, the WCJ awarded Worker $8374 in benefits and found that $9000 was a reasonable attorney fee. The worker in *Mieras* challenged the amount of the fees, 1996–NMCA–095, ¶ 21–22, 122 N.M. 401, 925 P.2d 518. Worker in this case does not independently challenge the amount of the attorney fees; instead, his challenge to the cap assumes that he would have secured a higher award if the cap did not exist. Worker puts the cart before the horse. Worker must first show that the fee is unreasonable or, as in *Mieras*, have the WCJ make such a finding. *Id.* ¶ 19. In this case, Worker's total attorney fees are $14,488, consisting of $5800 awarded in the original compensation order plus $9000 awarded as a result of the present case. The cap in this case is increased from $12,500 to $15,000 because of the bad faith award. Section 52–1–54(I). Consequently, Worker's total fee is still just barely under the cap. Worker has not been harmed by the cap and therefore has no standing to assert a challenge to its constitutionality. *See Mieras.*

## CONCLUSION

{30} For the reasons discussed above, we affirm in all respects except for the fourth issue—payment of attorney fees. On that issue, we remand with instructions to WCJ to follow Section 52–1–54(F)(4) and require CNA to pay all of Worker's attorney fees.

{31} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and A. JOSEPH ALARID, Judges.