This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-36527

**ALFRED J. MARTIN, JR.,**

Worker-Appellee/Cross-Appellant,

v.

**STATE OF NEW MEXICO, HUMAN SERVICES DEPARTMENT, and RISK MANAGEMENT DIVISION,**

Employer/Insurer-Appellants/Cross-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**David L. Skinner, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Appellee

Paul L. Civerolo, L.L.C.
Evie M. Jilek
Albuquerque, NM

for Appellants

### MEMORANDUM OPINION

**MEDINA, Judge.**

**{1}** State of New Mexico Risk Management Division (Employer), and Alfred J. Martin (Worker) each appeal the Workers' Compensation Judge's (WCJ's) order awarding Worker permanent total disability (PTD) benefits, loss of use benefits, and attorney fees. Employer argues that: (1) Worker sustained only one compensable accidental injury, entitling him to a single statutory cap of attorney fees; (2) Worker is not entitled to PTD benefits because Worker's impairment rating due to brain injury improperly included

impairments to other body parts and preexisting impairments; and (3) loss of use benefits should not have been awarded in addition to PTD. Worker, in turn, argues that the WCJ erred in failing to find a third compensable accidental injury entitling Worker to an additional award of permanent partial disability (PPD) benefits and attorney fees. We reverse in part and affirm in part.

**BACKGROUND**

**{2}** Worker underwent a total knee replacement on his left knee in November 2009. On December 9, 2009, Worker slipped and fell on an icy sidewalk, disrupting his knee replacement and causing further damage to the knee and tendons. The parties stipulated that Worker's fall arose out of and occurred in the course of his employment. Worker underwent surgery to repair the damage to his left knee on December 15, 2009. After surgery, Worker's surgeon warned Worker that he would likely suffer an infection due to the reopening of the surgical site within a month of his knee replacement surgery. Due to persistent pain and signs that the prosthetic materials were loose, Worker underwent another knee surgery on December 15, 2010, which included the complete removal of the left knee replacement components and cement; insertion of a custom antibiotic cement mold; and insertion of calcium phosphate antibiotic beads.

**{3}** Biopsies of tissue collected during surgery revealed bacterial infection in Worker's knee. The infection was treated with Daptomycin, administered intravenously via a catheter (PICC line) inserted into Worker's left knee. Worker was discharged on December 19, 2010, with the PICC line in place. On December 29, 2010, Worker suffered a rare and unexpected reaction to the Daptomycin, which developed into eosinophilic pneumonia and prolonged hypoxia.[1] Worker was transported to the hospital where he lost consciousness and was placed on a ventilator for ten days. Worker reported total blindness when he regained consciousness. Worker's vision returned three days later, and he was discharged on January 11, 2011. Shortly after discharge, Worker's PICC line was removed and he was warned of the possibility of a pulmonary embolism. On January 28, 2011, Worker suffered a pulmonary embolism and was again hospitalized. After discharge on February 3, 2011, Worker began experiencing some memory loss, decreased organizational skills, and an inability to retain some information. Worker also experienced vision problems including accelerated macular degeneration[2] and trouble recognizing objects. Worker underwent two additional knee surgeries related to his work accident, one on April 6, 2011, and another on September 13, 2011.

---

[1]Hypoxia is defined as "[t]he presence of less than the normal amount of oxygen, as in the air, in the blood, in a tissue, in the lungs[.]" 3 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* H-284.1 (Matthew Bender 2008).

[2]In 2007 before the events at issue in this case, Worker developed macular degeneration in his right eye and showed early signs of macular degeneration in his left eye. Worker's treatment for his right eye consisted of monthly injections in his right eye. Also in 2007 Worker suffered retinal detachment in both eyes. Worker's retinas were reattached and he showed no evidence of persistent vision loss due to detachment. In December 2011 Worker's left eye developed macular degeneration and he began to receive injections in that eye as well. As of August 2016 Worker continued to receive monthly injections in both eyes to treat the macular degeneration.

**{4}** Worker timely filed a complaint with the Workers' Compensation Administration (WCA), and a trial was held on February 10, 2017. Worker and his wife testified at trial, and the WCJ admitted Worker's Exhibits 1 through 16, without objection. Those exhibits included: (1) Worker's medical records; (2) an IME report and addendum report; and (3) deposition testimony from Doctors Brian Shelly (Family Medicine), Kenneth Adams (Ophthalmologist), Robert Reidy (Ophthalmologist), and Kristen Reidy (Ophthalmologist). The WCJ also admitted Employer's Exhibits A through K without objection. Those exhibits included additional medical records and deposition testimony from Doctors Don Seelinger (neurology and electrodiagnostic medicine) and Rex Swanda (neuropsychologist), as well as Worker's deposition. After trial, the WCJ entered an order finding and concluding, in pertinent part:

1. Worker sustained [a] compensable injury to his left knee as a result of an accident on December 9, 2009[,] and [a] compensable injury to his brain as the result of a second compensable accident on December 29, 2010[;]

   . . . .

5. As a result of the work accident on December 9, 2009, and the "catastrophic cascade of medical crises" that ensued as a direct result of this accident, Worker suffered a brain injury as the result of a second accident on December 29, 20[10;]

6. Worker sustained a brain injury resulting from a single traumatic work-related injury that caused a permanent impairment of thirty percent . . . or more as determined by the current AMA Guides to the Evaluation of Permanent Impairment[;]

   . . . .

8. Worker is entitled to permanent total disability (PTD) benefits[,] pursuant to [NMSA 1978, Section] 52-l-25(A)(2) [(2003);]

   . . . .

13. Worker has sustained a 75 percent partial loss of use of his left knee. Worker is entitled to scheduled injury benefits at 75 percent or $501.91 per week for 150 weeks pursuant to [NMSA 1978, Section 52-l-43(A)(30), (B) (2003);]

   . . . .

15. Worker's attorney is entitled to an award of reasonable attorney fees, plus tax[;]

. . . .

57.     Solely due to the brain injury, and exclusive of . . . impairment . . .
        to any other body part, or any preexisting impairments of any kind,
        Worker has a 40 percent [Whole Person Impairment] WPI to his
        visual system.[3]

The WCJ concluded that Worker suffered two separate and distinct accidental injuries,
and awarded two statutory caps of attorney fees, including tax, in the amount of
$48,290.63, pursuant to NMSA 1978, Section 52-1-54 (2003, amended 2013).

**{5}**    Employer filed a motion to reconsider the WCA's compensation order. The WCJ
denied Employer's motion and issued an amended compensation order, confirming its
findings of facts and conclusions of law. The WCJ clarified that "Worker presented [two]
separate and distinct accidental injury claims allowing for two separate and distinct
awards of benefits under the [W]orkers' [C]ompensation [A]ct [(the Act)]." The WCJ also
determined that Worker did not receive a double recovery of benefits because the WCJ
awarded loss of use benefits for Worker's knee injury and PTD benefits for his brain
injury. Finally, the WCJ explained that he calculated Worker's impairment due to his
brain injury "based on the totality of the experts' opinions." These cross-appeals
followed.

## DISCUSSION

**{6}**    The parties' cross-appeals require this Court to address several issues. The first
issue is whether the WCJ correctly determined the number of compensable accidental
injuries Worker suffered, which in turn governs the WCJ's ability to award multiple caps
of attorney fees. The second issue is whether the WCJ erred by including Worker's
visual field and visual acuity impairments when assessing his brain impairment. Third is
whether the WCJ erroneously included preexisting impairments when assessing
Worker's brain impairment. Last, we evaluate the benefits awarded to Worker. In the
course of discussing this issue, we address both parties' arguments regarding awards,
including Employer's assertion that loss of use benefits cannot be awarded in addition
to PTD benefits, as well as Worker's contention that the WCJ erred in failing to
additionally award PPD benefits.

### Standard of Review

**{7}**    "In reviewing a workers' compensation decision we evaluate whether, based on
the whole record, the decision is supported by substantial evidence." *Madrid v. St.
Joseph Hosp.*, 1996-NMSC-064, ¶ 38, 122 N.M. 524, 928 P.2d 250. "We review the
evidence in the light most favorable to the decision, and we defer to the WCJ's
resolution of conflicts in the evidence." *Motes v. Curry Cty. Adult Det. Ctr.*, 2019-NMCA-
022, ¶ 14, 458 P.3d 557. "We review the WCJ's application of the law to the facts de

---

[3]The IME panel includes peripheral visual field, visual acuity, and cortical processing when discussing Worker's
visual system.

novo." *Ruiz v. Los Lunas Pub. Schs.*, 2013-NMCA-085, ¶ 5, 308 P.3d 983. "We will affirm the WCJ's decision if, after taking the entire record into consideration and applying the law to the facts de novo, there is evidence for a reasonable mind to accept as adequate to support the conclusion reached." *Flores v. McKay Oil Corp.*, 2008-NMCA-123, ¶ 7, 144 N.M. 782, 192 P.3d 777 (internal quotation marks and citation omitted).

## I.   Number of Compensable Accidental Injuries

{8}     In order to put the parties' arguments in context, we briefly set out the general requirements for compensable accidental injuries and its relation to the awarding of attorney fees under the Act. "[O]ur courts have long recognized that an 'accidental injury' is an unlooked-for mishap or some untoward event that is not expected or designed." *Griego v. Patriot Erectors, Inc.*, 2007-NMCA-080, ¶ 8, 141 N.M. 844, 161 P.3d 889 (internal quotation marks and citation omitted)). NMSA 1978, Section 52-1-28(A) (1987) provides:

>   A.     Claims for workers' compensation shall be allowed only:
>
>          (1)     when the worker has sustained an accidental injury arising out of and in the course of his employment;
>
>          (2)     when the accident was reasonably incident to his employment; and
>
>          (3)     when the disability is a natural and direct result of the accident.

Thus, for an accidental injury to be compensable under the the Act, it must "aris[e] out of" and occur "in the course of" the worker's employment. *Id.*; *see Velkovitz v. Penasco Indep. Sch. Dist.*, 1981-NMSC-075, ¶ 2, 96 N.M. 577, 633 P.2d 685 ("For an injury to be compensable it must be caused by an accident arising out of and in the course of employment." (internal quotation marks and citation omitted)).

{9}     " 'Arising out of' and 'in the course of employment' are two distinct requirements." *Schultz ex rel. Schultz v. Pojoaque Tribal Police Dep't*, 2014-NMCA-019, ¶ 8, 317 P.3d 866 (quoting *Hernandez v. Home Educ. Livelihood Program, Inc.*, 1982-NMCA-079, ¶ 9, 98 N.M. 125, 645 P.2d 1381). "For an injury to arise out of employment, the injury must have been caused by a risk to which the injured person was subjected in his employment." *Velkovitz*, 1981-NMSC-075, ¶ 2. "[A]n injury occurs in the course of employment when it takes place within the period of employment, at a place where the employee may reasonably be, and while the employee is reasonably fulfilling the duties of employment or doing something incidental to it." *Schultz*, 2014-NMCA-019, ¶ 8 (internal quotation marks and citation omitted).

**{10}**   The Act imposes a statutory cap on attorney fees per compensable accidental injury. NMSA 1978, Section 52-1-54(E) (2003, amended 2013), provides, in relevant part:

>  In all cases where compensation to which any person is entitled under the provisions of the . . . Act is refused and the claimant thereafter collects compensation . . . in an amount in excess of the amount offered in writing by an employer . . . , the compensation to be paid the attorney for the claimant shall be fixed by the [WCJ] hearing the claim . . . subject to the limitation of Subsection I of this section.

Subsection I, in turn, provides:

>  Attorney fees, including, but not limited to, the costs of paralegal services, legal clerk services and any other related legal services costs on behalf of a claimant or an employer for *a single accidental injury claim* . . . shall not exceed twenty-two thousand five hundred dollars ($22,500). This limitation applies . . . as a cumulative limitation on compensation for all legal services rendered in all proceedings and other matters directly related to *a single accidental injury* to a claimant.

(Emphases added.) Accordingly, the WCJ may only award—subject to an exception not relevant to this case—up to $22,500 in attorney fees for each compensable accidental injury the worker suffered. *Id.*; *see Meyers v. W. Auto*, 2002-NMCA-089, ¶ 27, 132 N.M. 675, 54 P.3d 79 (rejecting the worker's argument that Section 52-1-54(I) allows for a new attorney fees cap for each accidental injury claim, as opposed to each accidental injury).

**{11}**   Given this limitation on attorney fees, the parties dedicate the majority of their briefing to the issue of the number of compensable accidental injuries that Worker sustained. Both Worker and Employer argue that the WCJ miscalculated the number of compensable accidental injuries (and consequently the amount of attorney fees). Employer argues that there was only one underlying accidental injury: the December 9, 2009, slip and fall.[4] Worker, on the other hand, argues that there were three distinct accidental injuries: (1) his December 9, 2009, slip-and-fall; (2) his allergic reaction to the Daptomycin requiring hospitalization on December 29, 2010; and (3) the pulmonary embolism he suffered on January 28, 2011, following the removal of his PICC line. We

---

[4]Worker contends that Employer's argument is moot because Employer already paid in full the awarded fees. Worker cites *Montoya v. Zia Co.*, 1971-NMCA-105, 82 N.M. 774, 487 P.2d 202, in which this Court determined the worker's claim that his employer failed to pay required monthly installments was moot because the employer had since paid the installments and stated that it had no intention to stop making payments. *Id*. ¶¶ 4-6. In the present case, however, Employer argues that the WCJ erroneously granted multiple attorney fee awards because it found two distinct compensable accidental injuries, an issue that has not been resolved. Accordingly, Employer's argument is not moot. *See Gunaji v. Macias*, 2001-NMSC-028, ¶ 9, 130 N.M. 734, 31 P.3d 1008. ("A case is moot when no actual controversy exists, and the court cannot grant actual relief." (internal quotation marks and citations omitted)).

conclude that substantial evidence supports only one compensable accidental injury (i.e., the initial December 9, 2009, slip-and-fall).

## A. Worker's December 29, 2010, Allergic Reaction and Subsequent Hospitalization

**{12}** There is no dispute that Worker suffered a compensable injury when he slipped and fell on December 9, 2009. We therefore address the sufficiency of the evidence supporting the WCJ's determination that Worker's December 29, 2010, allergic reaction to the Daptomycin evidenced a second compensable accident. Employer contends that Worker's December 29, 2010, allergic reaction to the Daptomycin and subsequent hospitalization are compensable under the December 9, 2009, slip-and-fall but not as a separate accident because the evidence did not establish a separate work accident. For the reasons that follow, we agree.

**{13}** With regard to the requirement that the accident must arise out of employment, Worker does not point to, nor can we find, any evidence in the record that his allergic reaction was "caused by a risk to which [Worker] was subjected [to] in his employment." *Velkovitz*, 1981-NMSC-075, ¶ 2; *Lujan v. Payroll Express, Inc.*, 1992-NMCA-063, ¶ 20, 114 N.M. 257, 837 P.2d 451 ("To satisfy the 'arising out of' test, a worker must be able to show that upon considering all the circumstances, it is reasonably apparent that a causal connection exists between the working conditions and the injury that results."); *see* Rule 12-318(A)(4) NMRA (requiring arguments to be supported with "citations to . . . [the] record proper, transcript of proceedings, or exhibits relied on"). Because Worker fails to show that his injuries arose from his employment we need not reach arguments raised by Worker regarding the "in the course of" requirement, including the "traveling-employee" and "special errands" exceptions. *See Griego*, 2019-NMCA-007, ¶ 9, 458 P.3d 523 ("The principles 'arising out of' and 'in the course of' his employment must exist simultaneously at the time of the injury in order for compensation to be awarded." (alteration, omission, internal quotation marks, and citation omitted)).

**{14}** In the absence of evidence that Worker's allergic reaction requiring hospitalization on December 29, 2010, arose out of Worker's employment, the WCJ erred in concluding that Worker suffered a separate compensable accidental injury on December 29, 2010. *See* § 52-1-28(A). Therefore, it follows that the WCJ's award of a second cap of attorney fees was error. *See* § 52-1-54(I).[5]

## B. Worker's January 28, 2011, Pulmonary Embolism

---

[5]Employer also points out that the WCJ—in its order granting in part and denying in part Employer's motion for reconsideration—appeared to indicate that it granted the two statutory caps of attorney fees based on the number of accidental injury *claims* that Worker brought. We need not separately address this issue because if this were true, the WCJ's decision would also be contrary to precedent and constitute reversible error. *See Meyers*, 2002-NMCA-089, ¶ 27 (rejecting the worker's argument that Section 52-1-54(I) allows for a new attorney fees cap for each accidental injury claim).

**{15}** Worker also argues that the WCJ erred in not awarding a third cap of attorney fees because the pulmonary embolism Worker suffered after removal of the PICC line constituted a third compensable accident. However, Worker again fails to point to, nor can we find, any evidence in the record showing that the pulmonary embolism was "caused by a risk to which [Worker] was subjected [to] in his employment." *Velkovitz*, 1981-NMSC-075, ¶ 2. Consequently, Worker's pulmonary embolism does not qualify as a separate compensable accidental injury and therefore Worker was not entitled to additional attorney fees.

**{16}** Worker appears to argue that his allergic reaction and pulmonary embolism constituted separate accidental injuries because they were "natural and direct result[s]" of his December 9, 2009, slip-and-fall. In doing so, Worker confuses the requirements of Section 52-1-28(A)(3)—providing that a disability must be "a natural and direct result of the accident"—with those of Section 52-1-28(A)(1). Simply because a subsequent injury stems from a compensable accidental injury does not, by itself, mean that the former constitutes a separate compensable accidental injury entitling the worker to an additional cap of attorney fees. This is not to say that Worker could not receive compensation for his disabilities stemming from his allergic reaction to the antibiotics and his pulmonary embolism following the removal of his PICC line. As Employer concedes, these were compensable as natural and direct results of the December 9, 2009, slip-and-fall. *See* § 52-1-28(A)(3); *Smith v. Arizona Pub. Serv. Co.*, 2003-NMCA-097, ¶ 18, 134 N.M. 202, 75 P.3d 418 (holding that employers must "provide compensation under the Act for the totality of loss that proceeds as a natural and direct consequence of a work-related injury"). *Compare Tom Growney Equip. Co. v. Jouett*, 2005-NMSC-015, ¶¶ 21-30, 137 N.M. 497, 113 P.3d 320 (addressing liability of successive employers and distinguishing two separate accidental injuries where subsequent injury and disability stemmed from aggravation of the initial accidental injury), *with Baca v. Complete Drywall Co.*, 2002-NMCA-002, ¶¶ 15-19, 131 N.M. 413, 38 P.3d 181 (discussing an employer liability for delayed disabilities progressing from a worker's original injury and concluding that a worker suffered multiple disabilities from one accidental injury).

**{17}** Worker also argues that his allergic reaction and pulmonary embolism constituted compensable accidental injuries because they were "unlooked for mishap[s]." In support of his argument Worker directs us to NMSA 1978, § 52-1-19 (1987), as well as *Lyon v. Catron County Commissioners*, 1969-NMCA-108, 81 N.M. 120, 464 P.2d 410 and *Herndon v. Albuquerque Public Schools*, 1978-NMCA-072, 92 N.M. 635, 593 P.2d 470. However, Worker finds no support in the authorities on which he relies. Whether an injury is an "unlooked for mishap" is only relevant to the question of whether the injury was accidental, not whether the injury arose out of and occurred in the course of the worker's employment. *See Griego*, 2007-NMCA-080, ¶ 8. Because there was only one injury, Worker is entitled to only one attorney fees award.[6]

---

[6]In addition to substantive issues, Worker raises a policy argument criticizing the Act's statutory cap on attorney fees. While Worker may debate the merits of the Legislature's decision to impose a statutory cap on attorney fees, our role is to construe the law as written, not to second-guess the Legislature's policy decisions. *See State v.*

## II.     Brain Injury

**{18}**     The WCJ found, "Solely due to the brain injury, and exclusive of . . . impairment to any other body part, or any preexisting impairments of any kind, Worker has a 40 percent WPI to his visual system." As defined by the IME panel, Worker's visual system includes his peripheral visual field, visual acuity, and cortical processing.[7] Employer argues that the WCJ erred as a matter of law by including Worker's visual field and visual acuity impairments when calculating Worker's impairment caused by a brain injury. Employer asserts that these impairments resulted from damage to Worker's retina, which Employer contends is part of the eye—a scheduled body member under Section 52-1-43(A)(40)-(41), and therefore should not have been included in Worker's brain injury impairment calculation under NMSA 1978, Section 52-1-25(A)(2) (2003). Worker responds that the WCJ properly relied on expert testimony regarding visual system impairments when calculating Worker's brain injury impairment.

**{19}**     Employer asks this Court to interpret Sections 52-1-25(A)(2) and 52-1-43 to establish a broad legal distinction between interconnected body parts based on generic statutory language and despite a consensus of expert medical testimony in this case. "We review the interpretation of a statute de novo." *Molinar v. Larry Reetz Constr., LTD.*, 2018-NMCA-011, ¶ 19, 409 P.3d 956. "The Court's guiding principle when construing statutes is to determine and give effect to legislative intent." *Fowler v. Vista Care*, 2014-NMSC-019, ¶ 7, 329 P.3d 630 (internal quotation marks and citation omitted). To discern the Legislature's intent, we "look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Id.* (internal quotation marks and citation omitted). We recognize that, Section 52-1-25(A)(2) requires that permanent brain injury is to be determined "exclusive of the contribution to the impairment rating arising from any other impairment to any other body part, or any preexisting impairments of any kind," and Section 52-1-43(A)(40)-(41) indicates that the "eye" is "a specific body member." However, Section 52-1-25(A)(2) does not define the term "brain," and Section 52-1-43 does not define the term "eye" but only establishes distinct types of eye injuries. Indeed, nowhere in the Act are the terms "brain" or "eye" defined, nor is the retina specifically distinguished as part of the eye. Employer does not point to any other authority—or even a dictionary citation—establishing such a distinction. While the Act does not provide specific guidance on the matter, "[w]e consider the Act in its entirety, construing each section in connection with every other section[,]" *Molinar*, 2018-NMCA-011, ¶ 19,

---

*Maestas*, 2007-NMSC-001, ¶ 14, 140 N.M. 836, 149 P.3d 933 ("We adhere to the principle that a statute must be read and given effect as it is written by the Legislature, not as the court may think it should be or would have been written if the Legislature had envisaged all the problems and complications which might arise in the course of its administration." (alteration, internal quotation marks, and citation omitted)).

[7]Visual field is defined as "[t]he ability to detect objects in the periphery of one's visual environment, important for orientation and mobility." American Medical Association, *Guides to the Evaluation of Permanent Impairment*, 615 (6th ed. 2009). Visual acuity is defined as "[t]he ability to recognize small objects with high contrast, such as letters on a page, important for reading." *Id*. Because Employer appears to concede that impairment to Worker's cortical visual system can be considered a brain impairment, we do not address the propriety of its inclusion in the WCJ's brain injury impairment finding.

in order to "produce a harmonious whole." *Witcher v. Capitan Drilling Co.*, 1972-NMCA-145, ¶ 17, 84 N.M. 369, 503 P.2d 652 (internal quotation marks and citation omitted).

**{20}** Turning to other sections of the Act, we need not look far to find evidence that the Legislature intended the use of medical expertise in workers' compensation cases. Section 52-1-28(B) provides that a "worker must establish . . . causal connection as a probability by expert testimony of a health care provider . . . testifying within the area of his expertise." When construing NMSA 1978, Section 52-1-24(A) (1990), this Court concluded that the Act "requires the use of the AMA *Guides* when determining whether a worker is impaired" and went on to hold that in cases "requir[ing] some medical judgment in order to determine the degree of impairment, the WCJ may not determine the worker's impairment rating without a medical expert opinion." *Yeager v. St. Vincent Hosp.*, 1999-NMCA-020, ¶¶ 12, 17, 126 N.M. 598, 973 P.2d 850. The Act's incorporation of AMA guidance and required use of medical testimony to establish various statutory requirements evidences an intent to utilize medical expertise to effect the provisions of the Act. In turn it is reasonable to conclude that in the absence of any specific anatomical definitions in the Act, the Legislature also intended the use of medical expertise to address the nuances involved in human anatomy.

**{21}** Recognizing the nuance involved and that this matter required medical expertise outside of his ability, the WCJ stated, "Calculation of the impairment due to brain injury in this case is not at all straight forward[,] thus reliance on the totality of the experts' opinions was, in my opinion, a rational way to proceed." We agree. While "the opinion of an expert, even though uncontradicted, is not conclusive of the fact in issue[,]" *Chapman v. Jesco, Inc.*, 1982-NMCA-144, ¶ 3, 98 N.M. 707, 652 P.2d 257, "[t]he WCJ, as trier of fact, ultimately can accept or reject the evidence once admitted." *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 34, 134 N.M. 421, 77 P.3d 1014. In this case, the uncontradicted medical testimony establishes the retina is part of the brain. Dr. Kenneth Adams of the IME panel testified that "from an ophthalmology standpoint, the retina is a direct extension of the brain." Dr. Robert Reidy explained that "the retina itself . . . is the brain, in the same fashion that your occipital cortex is your brain, your frontal cortex is your brain, and your brainstem is your brain . . . the retina is the brain." Dr. Kristen Reidy opined that "[t]here's no argument with any knowledgeable eye professional that the retina is part of the brain."

**{22}** The WCJ accepted uncontradicted expert medical evidence establishing the retina as part of the brain. Absent statutory language clearly establishing the retina as part of the eye—and given the Legislature's intent to utilize medical expertise in the application of the Act—we cannot say that it was error to do so. We therefore conclude that, under the facts of this case, the WCJ did not err by including Worker's visual system impairments when calculating impairment due to brain injury.

## III.     Brain Impairment Calculation

**{23}** Employer argues that the WCJ erred by including Worker's preexisting impairments caused by macular degeneration in his determination of Worker's brain

impairment. Employer also contends the WCJ did not consider that Dr. Adams changed his initial evaluation of Worker's visual field impairment after reviewing previously unavailable medical records. Although we agree the WCJ likely included preexisting impairments when he found Worker had 46 percent WPI due to Worker's brain injury, even without inclusion of the preexisting impairment, Worker's WPI was sufficient to satisfy the requirements of Section 52-1-25(A)(2). We explain.

**{24}** The IME panel initially assigned Worker a 46 percent WPI attributable to traumatic brain injury, including 40 percent visual system impairment and 10 percent central nervous system impairment (cognitive impairment). As mentioned above Worker's visual system impairment includes visual acuity impairment, visual field impairment, and cortical impairment. Dr. Adams initially calculated Worker's visual field impairment as 22 percent, his visual acuity impairment as 28 percent, and cortical impairment as 15 percent. However, Worker's ophthalmology records prior to 2013 were not available to Dr. Adams at the time of his evaluation. Because Dr. Adams could not review Worker's previous records, he acknowledged that it "is not possible to know how much vision loss was due to acceleration of pre[]existing age related macular degeneration." Nevertheless, Dr. Adams estimated that 50 percent of the visual field impairment and 50 percent of the visual acuity impairment were attributable to a lack of oxygen following Worker's adverse reaction to antibiotics (i.e., the hypoxic event). In other words, Dr. Adams initially concluded that Worker suffered 11 percent visual field impairment and 14 percent visual acuity impairment (i.e., half of 22 percent and 28 percent) due to prolonged hypoxia.

**{25}** Employer later provided Dr. Adams Worker's ophthalmology records that were unavailable to the IME panel during its evaluation. After reviewing those records, Dr. Adams stated that he would likely change his assessment of Worker's visual acuity impairment attributable to the hypoxic event to between 9 and 14 percent. Upon further questioning by Employer, Dr. Adams attributed 5 percent of the revised 9 percent visual acuity impairment to Worker's left eye, leaving the balance of the impairment to the right eye. Dr. Adams did not change his evaluation of Worker's visual field impairment (11 percent) or cortical impairment (15 percent). Accounting for his revised assessment, Dr. Adams testified that even if overall visual acuity were reduced to 9 percent, Worker's visual system impairment would be 31 percent, including the 11 percent visual field and 15 percent cortical impairments.

**{26}** In the compensation order, the WCJ initially acknowledged Dr. Adams' testimony and seemingly adopted his revised evaluation, combining the amended 31 percent visual system impairment with Worker's 10 percent cognitive impairment for an overall 38 percent WPI (after adjustment per the AMA *Guides*). However, in a subsequent finding, the WCJ appeared to incorporate the IME panel's original evaluation, finding that "Worker has a 40 [percent] WPI to his visual system." The WCJ then combined the 40 percent visual system impairment with the 10 percent cognitive impairment for an overall 46 percent WPI. Based on finding 46 percent impairment due to brain injury, the WCJ awarded permanent total disability (PTD) benefits, pursuant to Section 52-1-25(A)(2).

**{27}**  Dr. Adams—in both the addendum to the IME evaluation and in his testimony—provided assessments, which attempted to account for Worker's preexisting macular degeneration. To the extent Employer argues that Worker's visual acuity impairment is attributable to the hypoxic event is limited to deficits in the left eye alone, we note that at most, Dr. Adams opined that making such a determination is difficult, but that it is reasonable to conclude that both of Worker's eyes were affected. Additionally, as discussed above, Dr. Adams attributed 5 percent of his revised evaluation to deficits in the left eye and that impairment in the right eye would be the remaining balance. Nevertheless, Dr. Adams concluded that Worker at least suffered 9 percent impairment to his visual acuity as a whole due to the hypoxic event. That this percentage varies by eye when broken down further is inconsequential because the total accounts for estimated preexisting impairments in each individual eye.

**{28}**  While the WCJ's finding that Worker suffered a 40 percent impairment to his visual system appears to be in error, even when accounting for the revised assessment, the evidence in this case established that Worker suffered at least a 31 percent impairment to his visual system exclusive of preexisting impairments. When combined with Worker's 10 percent cognitive impairment the evidence established that Worker suffered a 38 percent WPI attributable to his traumatic brain injury, an amount more than the minimum 30 percent required by Section 52-1-25(A)(2). *See id.* (stating that a permanent total disability includes "a brain injury resulting from a single traumatic work-related injury that causes, exclusive of the contribution to the impairment rating arising from any other impairment to any other body part, or any preexisting impairments of any kind, a permanent impairment of *thirty percent or more* as determined by the current American medical association guide to the evaluation of permanent impairment." (emphasis added)). Because Worker's impairment due to brain injury meets the statutory requirements for the award of PTD benefits, we conclude that the WCJ's findings do not amount to reversible error.

## IV.     Benefit Awards

**{29}**  Finally, we address the WCJ's award of benefits. Both Employer and Worker appeal the WCJ's award. Employer argues that the WCJ should not have awarded loss-of-use benefits in addition to PTD benefits. Worker, on the other hand, argues that the WCJ should have awarded PPD benefits in addition to loss of use and PTD benefits. We address each argument in turn.

## A.     PTD and Loss of Use Benefits

**{30}**  Employer contends that the WCJ erred by awarding loss-of-use benefits for Worker's knee injury in addition to PTD benefits for Worker's brain injury, arguing that "the award . . . is contrary to the purpose of the scheduled injury section and departs from [New Mexico case law] determining that total disability precludes loss of use benefits." Our understanding of Employer's argument is that Worker's award of loss-of-use benefits for his knee injury overlaps with his award of PTD benefits for his brain injury. Although Employer cites a litany of cases to support this argument, including

*Baca*, 2002-NMCA-002, *Valdez v. Wal-Mart Stores, Inc.*, 1998-NMCA-030, 124 N.M. 655, 954 P.2d 87, and *Witcher* 1972-NMCA-145, Employer concedes that none of these cases directly support its position that a worker should not receive loss-of-use benefits in addition to PTD benefits. Nor does Employer attempt to explain how an award of loss-of-use benefits for an injury to a specific body member under Section 52-1-43(A), overlaps with an award of PTD for a brain injury under Section 52-1-25(A)(2), which must be determined "exclusive of the contribution to the impairment rating arising from any other impairment to any other body part." Given Employer's failure to develop a coherent argument against the propriety to the WCJ's award, we decline to address it any further. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (stating that "[t]o rule on an inadequately briefed issue . . . creates a strain on judicial resources and a substantial risk of error"); *Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

## B.    PPD Benefits

**{31}**    Worker also asserts that the WCJ erred in failing to award PPD benefits for impairments caused by the removal of Worker's PICC line and resulting pulmonary embolism. Employer contends that Worker did not preserve this argument because Worker failed to timely raise it below. In response, Worker argues that he preserved this argument because the pleadings and evidence presented provided "[t]he factual basis for finding multiple accidents[,]" and Worker fairly invoked a ruling by the WCJ by raising the issue in his response to Employer's motion to reconsider. We agree with Employer that Worker failed to preserve his argument.

**{32}**    "We will not review arguments that were not preserved[.]" *Vill. of Angel Fire v. Bd. of Cty. Comm'rs of Colfax Cty.*, 2010-NMCA-038, ¶ 15, 148 N.M. 804, 242 P.3d 371. "In order to preserve an issue for appeal, [a party] must have made a timely and specific objection that apprised the [WCJ] of the nature of the claimed error and that allows the [WCJ] to make an intelligent ruling thereon." *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 56, 146 N.M. 853, 215 P.3d 791; *see also* Rule 12-321(A) NMRA ("To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked.").

**{33}**    The WCJ entered a pre-trial order in which the parties stipulated that if PTD benefits were not awarded "Worker is entitled to . . . PPD benefits based upon his whole person impairment plus modifier values[.]" Following trial, Worker submitted proposed findings and conclusions related to PPD "only in the event that PTD benefits are not awarded." After the WCJ entered its compensation order in which he awarded PTD and loss-of-use benefits, Employer filed a motion for reconsideration seeking reconsideration of the award of loss-of-use benefits in addition to PTD benefits. In response to Worker's motion for reconsideration, Worker argued, "If the [c]ompensation [o]rder is reconsidered, Worker requests a finding that he sustained three separate and distinct accidental injuries and requests an award of additional attorney fees due to

having three accidental injury claims." At no time, however, did Worker argue that he was entitled to PPD benefits *in addition to* the awarded PTD benefits.

**{34}** Without specifically arguing that impairment caused by his pulmonary embolism necessitated a separate and additional award of PPD, Worker failed to specifically apprise the WCJ of this claim and thus failed to invoke a ruling on this issue. *See Graham v. Cocherell*, 1987-NMCA-013, ¶ 16, 105 N.M. 401, 733 P.2d 370 ("[W]e are a court of review and are limited to a review of the questions that have been presented to and ruled on by the trial court."); *see also State v. Vandenberg*, 2003-NMSC-030, ¶ 52, 134 N.M. 566, 81 P.3d 19 ("In analyzing preservation, we look to the arguments made by [the party] below."). Nor could Employer be expected to develop an argument or present evidence at trial in response to an issue that was never raised until after trial. *See Sandoval*, 2009-NMCA-095, ¶ 56 (stating that one of the primary purposes for the preservation rule is "to allow the opposing party a fair opportunity to respond to the claim of error and to show why the court should rule against that claim"). This is especially true when the parties stipulated to PPD as a contingent award only.

**{35}** The fact that Worker argued for an additional finding of a third compensable injury for his pulmonary embolism in his response to Employer's motion for reconsideration does not change our conclusion. First, Worker's discussion of the pulmonary embolism did not include a request for additional PPD benefits but only an award of additional attorney fees. Therefore, the WCJ cannot be said to have been "apprised . . . of the nature of the claimed error [or allowed] to make an intelligent ruling thereon." *See id.* Second, even if Worker's response was sufficient to apprise the court of the PPD issue, raising an issue that could have, and should have, been argued during trial in a post-trial motion is generally considered insufficient to preserve the issue. *Cf. id.* ("Generally, a motion for a new trial cannot be used to preserve issues not otherwise raised during the proceedings.").

**{36}** Finally, Worker summarily argues that this Court should nonetheless address his argument under the general public interest or plain error exceptions to our preservation requirement *See* Rule 12-321(B)(2) (listing exceptions to the preservation requirement). However, Worker fails to explain how our decision on this issue would "affect[] the interests of the [s]tate at large or affects the law that will be applied to a large number of cases in the near future." *O'Neel v. USAA Ins. Co.*, 2002-NMCA-028, ¶ 21, 131 N.M. 630, 41 P.3d 356. Nor does Worker explain how any purported error by the WCJ in failing to additionally award PPD benefits constituted plain error by "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings." *Living Cross Ambulance Serv., Inc. v. N.M. Pub. Regulation Comm'n*, 2014-NMSC-036, ¶ 11, 338 P.3d 1258 (internal quotation marks and citation omitted). Accordingly, we decline to invoke either of these exceptions to the preservation requirement and decline to address Worker's contention that the WCJ erred in not also awarding PPD benefits.

**CONCLUSION**

**{37}** For the foregoing reasons, we reverse the WCJ's finding that Worker suffered two compensable accidental injuries and its corresponding additional award of attorney fees, and we remand for the limited purpose of determining the appropriate attorney fees in accordance with this opinion. We affirm the WCJ's award of PTD benefits and loss of use benefits.

**{38}** **IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**BRIANA H. ZAMORA, Judge**